# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

——————————

No. 98-2279WM

——————————

| | |
|---|---|
| Christopher Dale O'Bannon; Justin Bradley O'Bannon, by and through their duly appointed next friend, Sharon Michelle O'Bannon; David L. O'Bannon; and Ruth E. Rialti, | * <br> * <br> * <br> * <br> * <br> * |
| Appellants, | * On Appeal from the United <br> * States District Court <br> * for the Western District |
| v. | * of Missouri. <br> * <br> * |
| Union Pacific Railroad Company; National Railroad Passenger Corporation, doing business as Amtrak, | * <br> * <br> * <br> * |
| Appellees. | * |

——————————

Submitted: November 6, 1998

Filed: February 2, 1999

——————————

Before RICHARD S. ARNOLD, HEANEY, and JOHN R. GIBSON, Circuit Judges.

——————————

RICHARD S. ARNOLD, Circuit Judge.

This case arises out of an accident in which Kevin O'Bannon was killed when his truck was struck by an Amtrak train. Mr. O'Bannon's statutory survivors brought a wrongful-death claim against Amtrak, the official title of which is the National Railroad Passenger Corporation, and also against the Union Pacific Railroad Company,

which operated and controlled the railroad crossing where the accident took place. The District Court[1] granted summary judgment in favor of the Union Pacific, holding that the plaintiffs' claim was preempted by federal law. The case against Amtrak went to trial, and the jury returned a verdict in favor of the defendant. Plaintiffs appeal. The principal question presented is whether there was sufficient evidence to avoid summary judgment on the preemption issue, a question that depends on whether warning devices at the crossing were paid for by federal funds. We affirm.

## I.

The crossing where the accident occurred is located in Pettis County, Missouri, and is known as the Sellers Road crossing. The crossing was protected by two crossbucks. The parties agree on the basic principles of law to be applied. In <u>CSX Transportation, Inc. v. Easterwood</u>, 507 U.S. 658 (1993), the Supreme Court held that state tort claims are preempted by federal law, the Federal Railroad Safety Act of 1970, 45 U.S.C. §§ 2101 <u>et seq.</u>, see also 23 C.F.R. §§ 646.214(b)(3) and (4), if "federal funds participate in the installation of the [warning] devices . . .." <u>Easterwood</u>, 507 U.S. at 670. See also <u>Elrod v. Burlington Northern R. Co.</u>, 68 F.3d 241 (8th Cir. 1995).

What is the state of the record on the source of funding for the two crossbucks at the Sellers Road crossing? Affidavits submitted by Union Pacific in support of its motion for summary judgment establish that the Missouri Public Service Commission, on July 25, 1979, entered an "order authorizing installation of warning signs." This order approved a contract between the Missouri Highway Commission and the Missouri Pacific Railway Company (predecessor of Union Pacific) for the installation of "two reflectorized crossbucks warning signs at each public highway crossing of the

---

[1]The Hon. Dean Whipple, United States District Judge for the Western District of Missouri. One of the District Court's opinions is reported at 960 F. Supp. 1411 (W.D. Mo. 1997).

railroad's tracks in the state of Missouri where such protection is not already in place." App. 164. It was the responsibility of the Railroad to install the crossbucks. The State would reimburse 90 per cent. of the cost, and the State had received federal funding for the project. Attached to the contract for the installation of the crossbucks was a tabulation for each county in Missouri, listing the crossbucks and warning devices required. The tabulation for Pettis County included the Sellers Road crossing and listed one crossbuck and one wooden post at that location.

The defendant's affidavits further established that on May 19, 1982, George Satterlee, an employee of the Missouri Highway and Transportation Commission, recommended payment for 222 reflectorized crossbucks and 206 posts in his district, which included Pettis County. Assuming reimbursement in federal funds at the rate of 90 per cent., which is the rate provided by law, installation of this number of crossbucks and posts would have entitled the Railroad to a payment from the State in the amount of $31,660.00. On June 16, 1983, the Railroad received payment in the amount of $34,488.00. According to an affidavit submitted by the defendant, this payment was "for the installation of crossbucks in Missouri." Business records of the Missouri Division of Transportation, produced by the plaintiffs, revealed that the Railroad was to install, in the entire state, 1,300 reflectorized crossbucks and about 1,000 new posts. In 1982, the Railroad reported by letter that almost all the crossbucks and posts required in the state had been installed. If this was true, a federally funded payment to the Railroad of approximately $175,700.00 should have been made. The only evidence of payment, however, was the $34,488.00 received in 1983.

As the plaintiffs point out, this amount does not match either the amount of $31,660.00 requested in 1982 for the six-county area that included Pettis County, or the much higher figure of $175,700.00 the Railroad should have received for installing crossbucks and posts throughout the entire state. Plaintiffs rely, in addition, on two affidavits from people familiar with the crossing. One such affidavit, made by a neighbor, states that the two crossbucks now at the Sellers Road crossing have been

there since 1968. "To my knowledge," the affiant says, "these crossbucks are no different nor have the signs been changed" during that period of time. In addition, Emmet W. Fairfax, Pettis County Sheriff from 1961 to 1977, stated in an affidavit that the crossing had had crossbucks since 1961, and that as of 1997, two years after the accident, the crossbucks appeared to be the same in all respects as they had been since 1961.

On this state of the record, plaintiffs argue, a rational jury could find that the crossbucks at the Sellers Road crossing had been there since before 1979, the date of the Public Service Commission order on which Union Pacific relies. Further, plaintiffs assert, even if crossbucks were installed at Sellers Road after 1979, a jury would not have to find that they were paid for by federal funds. An order was entered for installation of a crossbuck and a warning device at Sellers Road, Missouri Pacific billed the State for that installation, and an employee of the State requested that the bill be paid. Thereafter, Missouri Pacific was paid an amount of money sufficient to cover the entire six-county district, but the amount was too large to be entirely attributable to that district. The payment, therefore, plaintiffs argue, could have been for warning devices anywhere in the State. It is not inescapably tied either to Pettis County or to the six-county district in which that county is located.

Although the question is not completely free from all doubt, we believe the District Court acted correctly in granting the Union Pacific's motion for summary judgment on this question. There is no doubt that the Public Service Commission, in 1979, ordered the installation of a warning device at the Sellers Road crossing. The Missouri Pacific thereafter billed the State for work that included this warning device. The State acknowledged that the billing was appropriate and ordered payment. An amount of money sufficient to cover the bill was then paid. It is not disputed that federal funds were part of the payment actually made. And, in addition to the evidence already referred to, Greg Hayes, a railroad liaison working for the Missouri Highway and Transportation Commission, has made an affidavit stating, among other things:

-4-

The "Contract for Crossbucks" and the tabulation [documents already referred to] indicate that the Highway Commission participated with federal funding and the Missouri Pacific to install one reflectorized crossbuck warning sign and one crossbuck post at the Sellers Road crossing.

App. 299.

We do not think that there is any substantial likelihood that the State would pay the Railroad for work that the Railroad had not done. Nor do we find significant the fact that the only record of payment is for $34,488.00, an amount much smaller than the amount that would actually have been due for warning devices installed throughout the entire State. Whether payment was made for devices located outside Pettis County is not our concern. The evidence before us is that the State was billed for each of the Pettis County locations included in the PSC order, and that, thereafter, an amount of money more than sufficient to cover the bill was paid. The inference is very strong that the installation at the Sellers Road crossing was paid for.

Plaintiffs point out that there in fact are two warning signs at the Sellers Road crossing, and that the Railroad's proof, at most, demonstrates that only one such sign was paid for by federal funds. An entirely plausible explanation is that only one of the crossbucks at the crossing needed to be replaced when the PSC issued its order in 1979. In any event, the PSC order required the installation of only one crossbuck and one post, and the bill submitted by the Railroad, which, as we have shown, the State almost certainly paid, covered exactly what the contract required. Preemption occurs when all warning devices for which federal payment is to be made have been installed and are operating. See St. Louis Southwestern Ry. Co. v. Malone Freight Lines, Inc., 39 F.3d 864, 867 (8th Cir. 1994).

Plaintiffs urge that the affidavits submitted by the neighbor, Mr. Allen, and the former Sheriff would justify a finding of fact that no devices at all were installed after 1979, that the crossbucks present at the time of the accident, in 1995, had in fact been there for many years before 1979.  We disagree.  These affidavits, especially when read in the light of the later-taken deposition of Mr. Allen, the neighbor, show only that crossbucks <u>appearing</u> to be the same have been at the crossing since 1961.  At his deposition, Mr. Allen conceded that he was only speculating that he testified that the crossbucks had never been replaced.  App. 283, 317-18.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when "there is no genuine issue as to any material fact . . .."  The Supreme Court has emphasized the importance of the word "genuine."  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . .   In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a <u>genuine issue for trial</u>.'  Fed. Rule Civ. Proc. 56(e) (emphasis added)."  <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  Perhaps plaintiffs here have raised a metaphysical or theoretical issue of fact.  They have not raised a genuine one, and we therefore affirm the action of the District Court entering judgment for Union Pacific as a matter of law on the issue of federal preemption.

II.

We now turn to the plaintiffs' appeal against the judgment entered on the jury's verdict for the defendant National Railroad Passenger Corporation, doing business as Amtrak.  Plaintiffs urge four points for reversal.  They argue that the District Court should have granted a mistrial when, during voir dire, counsel for Amtrak stated that his client had no liability insurance; that it was error for the Court to fail to take judicial notice of the number of feet per second traveled by an object, such as a train or car, going a certain number of miles per hour; and that a police officer should not

have been allowed to give his opinion as to the "probable contributing circumstances" of the collision. With respect to these three points, we hold that there was no abuse of discretion. The District Court's order denying plaintiffs' motion for a new trial, filed April 8, 1998, fully discusses these points, and we have nothing of substance to add.

We believe the fourth point deserves somewhat more discussion. Plaintiffs argue that the District Court should have disqualified itself because one of its law clerks had, during the first eight months that this case was pending in the District Court, lived in the same house with one of counsel for defendants. The case was filed in January of 1996, and the two men shared a house until August of 1996. No substantive rulings on the case were made during this eight-month period, and, by the time the case came to trial, the law clerk had left the Court's employ.

The District Court held, applying the standard set forth in 28 U.S.C. § 455(a), that the circumstances alleged would not cause its impartiality to be reasonably questioned. As the Court further observed, the standard here is an objective one. Would the average person, knowing the facts alleged by the parties seeking disqualification, question the Judge's impartiality, and, if so, would the question be reasonable? See A.J. v. Kierst, 56 F.3d 849, 861 (8th Cir. 1995).

We agree with the District Court. Plaintiffs argue that law clerks are bound by the same ethical rules as judges, and that law clerks are thus forbidden to do anything that the judge could not do. If a judge cannot hear a case in which his or her roommate or housemate appears as counsel, then, it is urged, the judge may not hear a case in which a law clerk has a roommate or housemate who is counsel. We think the argument misunderstands the law and is contrary to common sense. A judge might well instruct a law clerk not to work on a case in which one of the lawyers is a close friend, housemate, or the like of the law clerk. That would be a reasonable decision for a judge to make, and, in fact, a judge might consider such a decision ethically obligatory. What plaintiffs' argument in the present case overlooks is that cases are

decided by judges, not law clerks. If, for example, a law clerk owns stock in a certain company, we do not think that any reasonable person would argue that the judge, who does not own any such stock, should be disqualified in a case in which the company is a party. This is a subject, of course, about which it is difficult to make hard and fast rules. Requests for disqualification, except where disqualification is mandatory by statute, call for the exercise of discretion and reasoned judgment. In <u>Hall v. Small Business Administration</u>, 695 F.2d 175 (5th Cir. 1983), for example, a case cited by plaintiffs, a magistrate judge was required to disqualify himself when his only law clerk had been, at one time, a member of the plaintiff class in the pending case, had before her employment with the judge expressed herself as convinced of the correctness of the plaintiff's position in the case, and had, before judgment was rendered in the case, accepted employment with the plaintiff's counsel. This combination of circumstances, in our view, is much more compelling than what we have before us in the present appeal. In the circumstances of this particular case, we hold that the District Court did not abuse its discretion in denying the motion for disqualification.

\*     \*     \*     \*

For the reasons we have given, the judgment is affirmed as to both defendants.

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.