The SECURITY FIRST BANK, Conservator of the Estate of Shane R. Norman, A Minor, Plaintiff,

v.

BURLINGTON NORTHERN and Santa Fe Railway Company, A Foreign Corporation, Defendant.

Burlington Northern and Santa Fe Railway Company, Defendant and Third–Party Plaintiff,

v.

Fred A. Lockwood, Special Administrator of the Estate of Ben C. Norman, Third–Party Defendant.

Burlington Northern and Santa Fe Railway Company, Defendant and Third–Party Plaintiff,

v.

County of Dawes, A Political Subdivision of the State of Nebraska, Third–Party Defendant.

No. 7:01CV3247.

United States District Court, D. Nebraska.

Aug. 2, 2002.

Patrick M. Connealy, Crites, Shaffer Law Firm, Chadron, NE, Michael J. Javoronok, Javoronok Law Firm, Scottsbluff, NE, Counsel for Security First Bank, Shane R. Norman.

Thomas C. Sattler, Wolfe, Snowden Law Firm, Lincoln, NE, Counsel for Burlington Northern and Santa Fe Railway.

Leland K. Kovarik, Jr., Holtorf, Kovarik Law Firm, Gering, NE, Counsel for Fred Lockwood, Special Administrator of the estate of Ben C. Norman.

Vincent Valentino, Angle, Murphy Law Firm, York, NE, Counsel for County of Dawes, a Political Subdivision of the State of Nebraska.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the court upon the motion for partial summary judgment (filing 27) filed by the defendant and third-party plaintiff, Burlington Northern and Santa Fe Railway Company (BNSF'), and upon the motion to dismiss (filing 48) filed by the third-party defendant, County of Dawes (County). Both motions will be granted in part and denied in part.

This action stems from a railroad crossing accident that occurred on March 8, 1999, near Crawford, Nebraska. The two-track crossing, locally known as "Horn Crossing," was marked with reflectorized cross buck warning signs. Involved in the accident were a minivan, operated by Ben Norman, and a short train of BNSF pusher engines. Ben Norman was killed in the accident, while his 15–year–old son, Shane, who was the only other occupant of the vehicle, sustained severe personal injuries.

The plaintiff, The Security First Bank, as conservator for Shane Norman, filed suit in the District Court of Dawes County, Nebraska, on September 7, 2001. BNSF removed the action to federal court, based upon diversity jurisdiction, on September 27, 2001, and has since filed separate third-party complaints against the County and the special administrator of Ben Norman's estate, seeking either indemnification or contribution in the event that BNSF is found liable (or equitable subrogation in the event that BNSF settles the claims against it). The third-party complaints also request that the plaintiff's damages be allocated among BNSF, the County, and the Norman estate, in accordance with Nebraska's comparative negligence statute.

The plaintiff alleges that "lack of visibility due to weather and vegetation made the pusher engine difficult to see especially considering the grade and angle of this crossing, and the condition of the road was slick and snow covered." (Filing 1, exhibit A, "Petition," at ¶ 6.) Further, "[i]mmediately before the grade crossing, Shane saw the northbound pusher engine. Shane did not see a light on the pusher engine, nor did the pusher engine give an audible signal. Shane yelled for his father, but his father was unable to stop in time to avoid a collision between the minivan and the pusher engine." (*Id.*, at ¶ 7.)

It is claimed that BNSF was negligent in (a) "failing to warn of the approach of the train by sounding its whistle and bells in a timely fashion or with guards or flag personnel or lights," (b) "maintaining an extra hazardous crossing," (c) its train crew failing "to keep the train from traveling at or below the stated speed limit for the crossing," (d) its train crew failing "to keep and maintain a proper lookout for motor vehicles approaching the crossing," (e) its train crew failing "to timely apply the brakes to the train," and (f) failing "to maintain the right of way, including appropriate site (sic) distances." (Id., at ¶ 8.)

In support of its motion for summary judgment, BNSF argues that any claim involving crossing warnings or signalization, locomotive speed or equipment, or right-of-way maintenance is preempted by federal law, and that the evidence shows its compliance with applicable safety regulations in these several areas. The only specification of negligence which is not di-

rectly challenged by BNSF's motion is the plaintiff's claim that the train crew failed to maintain a proper lookout for approaching vehicles.

For its third-party complaint against the County, BNSF alleges that the County "is or may·be liable to Third–Party Plaintiff BNSF for all or part of Plaintiff's claim against BNSF arising out of the circumstances as alleged in ... [Plaintiff's petition]." (Filing 35, ¶ 6.) The "circumstances as alleged" in the petition are generally stated to include, without limitation, the specifications of negligence against BNSF and also the allegation concerning road conditions and vegetation.

In support of its motion to dismiss, the County challenges the sufficiency of this allegation and contends that BNSF has failed to specify any acts of negligence on the part of the County. It is also argued that the third-party complaint must be dismissed because BNSF has failed to comply with provisions of the Nebraska Political Subdivisions Tort Claims Act.

### BNSF's Motion for Partial Summary Judgment

 If federal funds have been expended for warning devices at a grade crossing, state law tort claims alleging negligence in the maintenance of the crossing are preempted. *Bock v. St. Louis Southwestern Ry. Co.*, 181 F.3d 920, 922 (8th Cir.1999), *cert. denied*, 529 U.S. 1086, 120 S.Ct. 1718, 146 L.Ed.2d 640 (2000). An allegation that a ·crossing is "extra hazardous" or inadequately protected does not change this result. Preemption occurs once a federally funded warning device is installed and operational. *See id.*

 BNSF has submitted the affidavit of Dan J. Rosenthal, a records custodian at the Nebraska Department of Roads (NDOR), to establish that the cross buck signs in this case were installed by the railroad sometime between 1978 and 1986 as part of a state-wide project that was undertaken pursuant to the federal Railroad–Highway Grade Crossing Program. (Filing 28, exhibit 2.) The documents that are attached to Mr. Rosenthal's affidavit show that Horn Crossing was included in the project, and that all work on the project was accepted as complete by the NDOR and the Federal Highway Administration as of 1988. Although this documentation is less detailed and less complete than might be desired, it is sufficient. *See O'Bannon v. Union Pacific R. Co.*, 169 F.3d 1088, 1089–91 (8th Cir.1999) (affirming summary judgment granted to railroad on similar evidence).

The only countervailing evidence offered by the plaintiff are the affidavits of two local residents, who each state that "[t]here have been cross bucks at Horn Crossing for as long as I can remember." (Filing 41, exhibits 5, 6.) These statements do not create a genuine issue of material fact. *See id.* (rejecting similar affidavits). Similarly, while the plaintiff has offered deposition testimony that was provided· by Mr. Rosenthal and by a BNSF official in connection with another lawsuit (filing 41, exhibits 9, 12), that testimony does not refute the NDOR documentation. Merely showing that there is some "metaphysical doubt" as to whether the work that was scheduled for Horn Crossing was actually performed, or whether the railroad was actually paid for the work with the earmarked federal funds, will not suffice. *See id.* Thus, there is no triable issue of fact regarding BNSF's alleged negligence in "failing to warn of the approach of the train by ... guards or flag personnel or lights," or in "maintaining an extra hazardous crossing."

 To the extent that the reference to "lights" in this allegation is intended to include the train's headlight, I also fail to find a genuine issue of material fact. While the petition alleges that "Shane did

not see a light on the pusher engine," he testified in his deposition that the did not know whether the train's headlight was on. (Filing 41, exhibit 7, at 15:7–18:8.) In an interview with the Nebraska State Patrol eleven days after the accident, he stated that "he did not hear a train horn or identify if the lights were on." (*Id.*) Not knowing or not being unable to identify if the train's headlight was on is not satisfactory proof of negligence.

■ It does not appear that the plaintiff is attempting to claim that the headlight equipment was inadequate. Likewise, the allegation that "the pusher engine [did not] give an audible signal" does not appear to involve an equipment issue (which would be subject to federal preemption). It merely is claimed that the pusher engine failed to "sound[ ] its whistle and bells in a timely fashion." I find that there is a genuine issue of material fact as to this limited claim of negligence.

Evidence supporting this claim includes Shane's deposition testimony and the affidavit of a neighbor who saw both the Norman vehicle and the pusher engines shortly before the accident. This witness "specifically remember[s] that the train did not blow its whistle as it approached the crossing," and she provides sufficient information to support her conclusion that "[i]f there had been a whistle on the day of the accident, I would have heard it." (Filing 41, exhibit 6.)

■ BNSF argues, however, that the plaintiff should be estopped from taking this position. In an earlier lawsuit brought against Ben Norman's estate, the plaintiff relied upon an affidavit by BNSF's engineer to oppose the defendant's motion for summary judgment. Included in the affidavit is a statement that "[a]s the pusher engines approached the crossing, we were traveling at about 50–51 miles per hour and I was blowing the horn on the engine." (Filing 28, exhibit 4.) I

find no legal support for this estoppel argument. Also, even if the argument had merit, this evidence does establish that the whistle was blown in a timely manner.

■ The engineer's speed estimate is corroborated by a tape recording on the lead locomotive, which indicates that the train was traveling 53–54 miles per hour as it approached the crossing. (Filing 28, exhibit 1.) Based upon track classification standards established by federal regulations and BNSF timetable specifications, the authorized train speed at the crossing was 60 miles per hour. (*Id.*)

The plaintiff does not dispute this speed evidence, but argues that bad weather is a "specific, individualized hazard" which may prevent the 60 mph speed limit from preempting its excessive speed claim. Inasmuch as the plaintiff merely alleges that the train crew was negligent in failing "to keep the train from traveling at or below the stated speed limit for the crossing," this argument concerns an issue which is outside the pleadings. Even if the issue had been properly raised, though, I would reject the plaintiff's argument.

While there is some evidence that visibility at the crossing was limited because of snow or blowing snow, and it is also alleged that the roadway was slick and snow covered, winter conditions such as this are not atypical "aberrations which the Secretary could not have practically considered when determining train speed limits under the FRSA." *O'Bannon v. Union Pacific R. Co.*, 960 F.Supp. 1411, 1420 (W.D.Mo.1997) (stating that "a 'specific individual hazard' must be a discrete and truly local hazard, such as a child standing on the railway."), *aff'd*, 169 F.3d 1088 (8th Cir.1999). The case law is surprisingly limited on this issue, but other district courts have also rejected claims that adverse weather conditions generally may constitute specific, individual hazards. *See Seyler v. Burlington Northern Santa Fe*

Corp., 102 F.Supp.2d 1226, 1236–37 (D.Kan.2000) (heavy rain and flash flood warning); *Cox v. Norfolk & Western Ry. Co.*, 998 F.Supp. 679, 685 (S.D.W.Va.1998) (snow covered tracks); *Stuckey v. Illinois Central R. Co.*, 1998 WL 97270, at *5 (N.D.Miss.Feb.10, 1998) (icy conditions), aff'd, 162 F.3d 96 (5th Cir.1998). *But cf. Bakhuyzen v. National Rail Passenger Corp.*, 20 F.Supp.2d 1113, 1117–18 (W.D.Mich.1996) (poor visibility due to snow limited to localized area).

BNSF argues that the train crew's alleged negligence in failing "to timely apply the brakes to the train" is subsumed by the excessive speed claim, and thus preempted, but it may also be linked with the crew's alleged failure to maintain a proper lookout. BNSF has not moved for summary judgment on the "lookout" claim.

Finally, there is the allegation that BNSF failed "to maintain the right of way, including appropriate site (sic) distances." It appears that this claim merely pertains to the allegation that "vegetation made the pusher engine difficult to see," and not to

any other crossing maintenance issues, such as warning signs.[1] Even so, the claim is preempted, at least in part.

■ A regulation promulgated by the Secretary of Transportation under the Federal Railroad Safety Act [2] "imposes only the duty to prevent the vegetation in and adjacent to the railbed from disrupting signs and signals. The Secretary did not impose a broader duty to control vegetation so that it does not obstruct a motorist's visibility of oncoming trains." *O'Bannon*, 960 F.Supp. at 1422–23. The evidence in the present case, including photographs that were taken of the crossing immediately following the accident, establishes that a motorist's view of the cross bucks was not obstructed by vegetation. (Filing 28, exhibits 3, 4.) Indeed, the photographs do not show any vegetation within the right-of-way that would have prevented Ben Norman from seeing the train. The claim thus fails without regard to preemption.[3]

In summary, the plaintiff may pursue its claims that BNSF was negligent in "failing

1. Nor does the plaintiff suggest in its brief that maintenance would include any issue regarding the design and construction of the "grade and angle of this crossing," which allegedly reduced visibility. Additionally, no argument is made that this factor was a specific, localized hazard for purposes of the excessive speed claim. Such an argument, if made, would fail for the same reason as the plaintiff's "bad weather" argument; namely, it is not alleged that the train was traveling too fast for conditions, but only that it was exceeding the established speed limit. In any event, "[w]arning devices, grade, angle, and proximity to highways are all general conditions of crossings that are amenable to uniform, national standards," and "defects related to these conditions are already accounted for in the Secretary's regulations governing maximum operational speeds." *O'Bannon*, 960 F.Supp. at 1421.

2. 49 C.F.R. § 213.37.

3. The claim may be further preempted by state statute. *See, e.g., O'Bannon*, 960 F.Supp. at 1423–24 (Missouri statute requiring railroads to control vegetation within 250 feet of crossings preempted negligence claim based on growth of vegetation outside this area). Neb.Rev.Stat. Ann. § 74–608 (Michie 1995) prohibits a railroad from destroying vegetation, other than noxious weeds, within its fenced right-of-way. The only exceptions to this statute, which is intended to provide cover for wildlife, are that between May 1 and August 15 each year the railroad shall destroy vegetation to a distance of 7 feet from the outermost rails, or at other places deemed necessary by the railroad, or when otherwise ordered by the county board. There is no evidence that BNSF failed to maintain the right-of-way in compliance with this statute. Another statute, however, requires all landowners to trim trees and undergrowth bordering public roads so as not to obstruct the view at or near railroad crossings. *See* Neb.Rev. Stat. Ann. § 39–1812 (Lexis 2000).

to warn of the approach of the train by sounding its whistle and bells in a timely fashion" and in its train crew failing "to keep and maintain a proper lookout for motor vehicles approaching the crossing" and failing "to timely apply the brakes to the train." The plaintiff's other negligence claims fail as a matter of law. Partial summary judgment will be entered accordingly.

### County's Motion to Dismiss

The County argues that BNSF's third-party complaint,[4] which merely alleges that "Dawes County is or may be liable to Third–Party Plaintiff BNSF for all or part of Plaintiff's claim against BNSF arising out of the circumstances as alleged in Exhibit 'A' [Plaintiff's petition] including, but not limited to, those allegations contained in paragraphs 7 and 8 therein," does not satisfy the pleading requirements of Fed. R.Civ.P. 8(a) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). I agree.

■■■■ Although Fed.R.Civ.P. 10(c) authorizes adoption by reference in third-party complaint of matter contained in the original complaint, it must be done with a degree of clarity which enables the third-party defendant to ascertain the nature and extent of the incorporation. *See Heintz & Co. v. Provident Tradesmens Bank & Trust Co.*, 29 F.R.D. 144, 145 (E.D.Pa.1961). It is not apparent that the County could be required to indemnify BNSF or contribute payment for the acts of negligence that are alleged in paragraph 8 of the plaintiff's petition, and while paragraph 7 mentions "the grade and angle of this crossing, and the condition of the road" as being considerations, negligence

is not alleged with respect to these areas over which the County might exercise some control.

While the usual procedure for raising a Rule 8(a) objection is by a motion for a more definite statement under Fed. R.Civ.P. 12(e), in this case dismissal of the third-party complaint, without prejudice, for failure to state a claim is appropriate— provided, however, that BNSF is granted leave to amend to cure the pleading deficiencies. In other words, I conclude that BNSF should be required to make the third-party complaint more definite.

■■■■ Of greater import is the question of whether BNSF can bring a third-party claim against the County without complying with the requirements of the Political Subdivisions Tort Claims Act, Neb.Rev. Stat. §§ 13–901 to 13–926. If not, it appears that amendment of the third-party complaint would be futile because BNSF does not purport to have presented its claim for contribution or indemnification to the County before filing its third-party complaint.

The starting point for answering this question is *Northland Ins. Co. v. State*, 242 Neb. 10, 14, 492 N.W.2d 866, 869 (1992), wherein the Nebraska Supreme Court held that "an action for contribution is covered under Nebraska's State Tort Claims Act, but only if a private person would be liable to the claimant for the damage, loss, injury, or death." The County argues, without any refutation by BNSF, that "[t]he only logical extension of [the *Northland* ] holding is that the express requirements of the [Political Subdivisions Tort Claims] Act apply to third-party complaints [for contribution or indemnity]." (County's brief, at 8–9.)[5]

---

4. Leave of court for the filing of the third-party complaint was granted on March 20, 2002. (Filing 33.)

5. Although *Northland* was decided with reference to the State Tort Claims Act rather than the Political Subdivisions Tort Claims Act, the case unmistakably holds that a claim for contribution against a joint tortfeasor is a "tort

BNSF does not dispute that *Northland* prevents it from suing the County for contribution or indemnification, but it takes the position that because the third-party complaint "seeks apportionment under Nebraska's comparative negligence statute, not a claim for money (and thus, a 'tort claim'), the reliance upon the Act to defeat BNSF's Third–Party Complaint is mis-

placed." (BNSF's brief, at 11.) This argument is rather curious, inasmuch as the third-party complaint expressly claims a right to contribution or indemnification (or equitable subrogation), and BNSF specifically requests an award of money damages on such claims.[6] It is also questionable whether a claim for "apportionment" exists under Nebraska substantive law.[7]

claim" as defined in both Acts (*i.e.*, "any claim against the State of Nebraska [or a political subdivision] for money only on account of damage to or loss of property or on account of personal injury or death caused by the negligent or wrongful act or omission of any employee of the state [or political subdivision], while acting within the scope of his or her office or employment, under circumstances in which the state [or political subdivision], if a private person, would be liable to the claimant for such damage, loss, injury, or death ...."). *See* Neb.Rev.Stat. Ann. § 81–8,2210(4) (Lexis 1999); Neb.Rev.Stat. Ann. § 13–903(4) (Lexis Supp.2001). The case also establishes that contribution is not confined to judgment debtors, as the Court "adopt[ed] the interpretation of the federal district court" in *Reese v. AMF–Whitely*, 420 F.Supp. 985, 987 (D.Neb.1976), that the language of *Royal Ind. Co. v. Aetna Cas. & Sur. Co.*, 193 Neb. 752, 229 N.W.2d 183 (1975), recognizing claims for contribution among negligent joint tortfeasors, "encompass[ed] both those against whom a plaintiff has successfully obtained a judgment and those whose liability remains to be fixed ...." *Northland*, 242 Neb. at 14–15, 492 N.W.2d at 869.

6. "Under Nebraska law, indemnification is available when one party is compelled to pay money which in justice another ought to pay, or has agreed to pay, unless the party making the payment is barred by the wrongful nature of his conduct. Indemnification is distinguishable from the closely related remedy of contribution in that the latter involves a sharing of the loss between parties jointly liable." *Warner v. Reagan Buick, Inc.*, 240 Neb. 668, 677, 483 N.W.2d 764, 771 (1992) (citations omitted). Contribution is the sharing of the cost of an injury as opposed to a complete shifting of the cost from one to another, which is indemnification. *Lackman v. Rousselle*, 7 Neb.App. 698, 712, 585 N.W.2d 469,

480 (1998), aff'd, 257 Neb. 87, 596 N.W.2d 15 (1999). Indemnity is available to one who engaged in merely passive neglect, but unavailable to one who engaged in direct and active negligence. *Warner*, 240 Neb. at 677, 483 N.W.2d at 771. The doctrine of equitable subrogation applies where a party is compelled to pay the debt of a third person to protect his own rights or interest, or to save his own property. *Rawson v. City of Omaha*, 212 Neb. 159, 164, 322 N.W.2d 381, 384 (1982).

7. As discussed in *Lackman v. Rousselle*, 257 Neb. 87, 95–96, 596 N.W.2d 15, 22 (1999), Nebraska law provides that "[a]ny person whose negligence was or may have been a proximate cause of an accident or occurrence alleged by the plaintiff, ... may be brought into the suit by any defendant in the manner provided in section 25–331 [governing third-party practice]." *See* Neb.Rev.Stat. Ann. § 25–323 (Michie 1995). A proportionate share of the plaintiff's noneconomic damages may then be allocated to such a third-party defendant under the comparative negligence statute, Neb.Rev.Stat. § 25–21,185.10, without regard to whether a judgment may be entered against such party. *See Lackman*, at 97, 596 N.W.2d at 22. *See, also, Slaymaker v. Breyer*, 258 Neb. 942, 948, 607 N.W.2d 506, 511 (2000). Because apportionment of damages does not strictly constitute a claim that the third-party defendant "is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff," *see* Fed.R.Civ.P. 14(a), it is doubtful that the Nebraska joinder procedure is available in federal court as a matter of third-party practice. *But cf. Corporation of Presiding Bishop Church of Jesus Christ of Latter–Day Saints v. Queen Carpet Corp.*, 5 F.Supp.2d 1246 (D.C.Utah 1998) (under *Erie* doctrine, district court allowed procedural third-party claim for apportionment under Utah law).

It is my opinion, however, that *Northland* does not inescapably lead to the conclusion that BNSF is prevented from seeking contribution or indemnification from the County. The Nebraska Supreme Court in that case was only concerned with answering the simple question of whether the State had consented to be sued for contribution by a joint tortfeasor. The Court did not discuss the procedural aspects of such a tort claim, and, in fact, it specifically declined to determine "whether it would be proper for a defendant to file a cross-claim in the original plaintiff's suit or institute an independent action for contribution by the original defendant without filing a claim under Nebraska's State Tort Claims Act." *Id.*, at 15, 492 N.W.2d at 869.

*Northland* involved an independent action for contribution that was filed by two insurance companies after they settled various lawsuits arising out of a motor vehicle accident. Their contribution claim, alleging that the State was negligent in maintaining the highway and in failing to warn of dangerous road conditions, was filed with the State Claims Board, and rejected by the Board, prior to the action being filed. The plaintiffs' petition was dismissed when the trial court determined that it had "no jurisdiction of the subject matter for the reason that a contribution or indemnity claim is not a tort action, under the State Tort Claims Act." *Id.*, at 13, 492 N.W.2d at 868. As identified by the Nebraska Supreme Court, the sole issue presented for its determination on appeal was "whether under Nebraska's State Tort Claims Act the State of Nebraska may be sued for contribution as an alleged joint tort-feasor." *Id.*, at 11, 492 N.W.2d at 867.

In answering this question in the affirmative, the Nebraska Supreme Court specifically relied upon *United States v. Yellow Cab Co.*, 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951), after noting that the Nebraska State Tort Claims Act was patterned after the Federal Tort Claims Act. The United States Supreme Court held in the first part of the *Yellow Cab* opinion that the FTCA "waives the Government's immunity from suit in sweeping language," and, based both upon the expansive wording and the Act's legislative history, "covers claims for contribution which would be due from the Government if the Government were a private individual." *Id.*, at 546–52, 71 S.Ct. 399.[8] The second part of its opinion held that the United States may be impleaded as a third-party defendant on a contribution claim.[9]

The State relied upon *Waldinger Co. v. P & Z Co., Inc.*, 414 F.Supp. 59 (D.Neb. 1976), "for the proposition that an action for contribution does not fall within the Act." *Northland*, 242 Neb. at 14, 492 N.W.2d at 869. The Nebraska Supreme Court summarily "reject[ed] the federal district court's conclusion," *id.*, apparently without realizing that Judge Denney's ruling in *Waldinger* actually was adverse to the State's position.

In *Waldinger*, the City of Omaha was named as a defendant in a negligence action involving the collapse of a slurry trench wall around the Omaha–Douglas County Civic Center. The City filed a third-party complaint against the building

---

8. This holding has also been extended to indemnification claims. *See Lockheed Aircraft Corp. v. United States*, 460 U.S. 190, 198, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983); *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 669–70, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977).

9. The FTCA was amended in 1966 to specifically provide that the Act's requirements for presentment and administrative denial of claims "do not apply to such claims as may be asserted under the Federal Rules of Civil Procedure by third party complaint, cross-claim, or counterclaim." 28 U.S.C. § 2675(a).

contractors and the Omaha–Douglas County Public Building Commission, seeking indemnification or contribution. The Commission moved to dismiss the third-party complaint for the City's failure to file a claim pursuant to the Political Subdivisions Tort Claims Act, arguing that "any claims not filed within one year of the injury are extinguished." *Id.*, 414 F.Supp. at 60. Judge Denney denied the motion, predicting "that the Supreme Court of Nebraska would hold that claims for contribution and indemnification are not within the meaning and intent of the Political Subdivision Tort Claims Act." *Id.* As explained in the opinion:

> Faced with similar statutes, the majority of courts have held that claims for indemnification and contribution from a political subdivision need not be filed pursuant to a tort claim act. These decisions are based on sound equitable principles. Contribution and indemnification are inchoate rights which do not arise until one tort feasor has paid more than his share of the damages or judgment. A plaintiff may sue one tort feasor or he may join all tort feasors in one suit. He may also wait more than a year to file his suit. To accept the Commission's argument that the claim for contribution or indemnification arises when the injury is incurred would allow plaintiff to choose which defendant would bear the burden by simply filing his lawsuit after the one year statute of limitations has run. The defendant joint tort feasor, having no prior knowledge of

a claim, would be unable to file a claim prior to being joined in the lawsuit.

*Id.* (citations omitted).

*Waldinger* plainly does not stand for the proposition that was urged by the State and rejected by the Nebraska Supreme Court in *Northland.* That is, Judge Denney did not hold that governmental immunity applies to claims for contribution or indemnity; to the contrary, his decision presupposed that immunity was waived by the Political Subdivisions Tort Claims Act. *Waldinger* instead holds that the Act's one-year filing requirement does not apply to claims for contribution or indemnification, and, in particular, that a third-party complaint is not precluded by the Act.[10] This holding was not directly material to any issue that was decided in *Northland.* In the absence of any dispositive ruling by the Nebraska Supreme Court, I will adhere to *Waldinger.*

IT IS ORDERED that:

1. Defendant's motion for partial summary judgment (filing 27) is granted in part and denied in part, as follows: Plaintiff's claims of negligence against Defendant are hereby dismissed except with respect to those negligent acts or omissions that are alleged in paragraphs 8.d and 8.e of Plaintiff's petition and in that portion of paragraph 8.a of the petition that alleges a failure to warn of the approach of the train by sounding its whistle and bells in a timely fashion.

2. Third–Party Defendant's motion to dismiss (filing 48) is granted in part and

---

**10.** While recognizing that the statutory requirement that the claim be filed within one year after the claim "accrued," *see* Neb.Rev. Stat. § 13–919(1) (formerly § 23–2416(1)), "could be interpreted to require the filing of a claim by a joint tort feasor after he has paid the judgment, since this is the time the claim accrues," Judge Denney concluded that "the imposition of a statute of limitations after judgment is rendered would serve no useful

purpose and would merely frustrate the desirable goal of trying a case in one lawsuit, as well as discourage out-of-court settlements.... The political subdivision has notice of the claim when it is served with a third party complaint, far in advance of time of judgment when literal application of the statute would require notice." *Waldinger,* 414 F.Supp. at 60–61.

denied in part, as follows: Pursuant to Fed.R.Civ.P. 12(b)(6), the Third Party Complaint (filing 35) is dismissed for failure to state a claim upon which relief can be granted; provided, however, that Third Party Plaintiff may file an amended pleading within twenty (20) days of today's date. In all other respects the motion is denied.