Motion for Rehearing Granted in Part and Denied in Part; Reversed and
Remanded; Opinions of October 5, 2004 Withdrawn and Opinion on Rehearing filed
November 29, 2005









Motion for Rehearing Granted in Part and Denied in
Part; Reversed and Remanded; Opinions of October 5, 2004 Withdrawn and Opinion
on Rehearing filed November 29, 2005.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-02-00688-CV

____________

 

MISSOURI
PACIFIC RAILROAD COMPANY 

D/B/A UNION PACIFIC RAILROAD COMPANY, Appellant

 

V.

 

PATRICIA
LIMMER, BILLYE JOYCE SMITH, AND 

BOBBYE JEAN NOTHNAGEL, Appellees

________________________________________________________

 

On Appeal from the 151st District Court

Harris County, Texas

Trial Court Cause No. 95-42790

 

________________________________________________________

 

O P I N I O N   O N  
R E H E A R I N G








Upon consideration of the motion
for rehearing filed by appellees Patricia Limmer, Billye Joyce Smith, and
Bobbye Jean Nothnagel (collectively referred to herein as the ALimmers@) and the
responses thereto, we conclude that the trial court did not err in ruling
against appellant Missouri Pacific Railroad Company d/b/a Union Pacific
Railroad Company (AUnion
Pacific@) as to
its preemption defense.  Accordingly, we
grant the Limmers= motion
for rehearing to this extent, deny the remainder of the Limmers= motion
for rehearing, withdraw the opinions issued in this case on October 5, 2004,
and issue the following opinion in their place.

In this wrongful-death action
arising from a collision between decedent Billy Limmer=s truck
and a train at a railroad crossing, this court must determine whether the trial
court erred in rejecting Union Pacific=s defense
that federal law preempts the Limmers=
negligence claims.  We conclude the trial
court did not err in rejecting Union Pacific=s
preemption defense because there is legally and factually sufficient evidence
to support the trial court=s implied
finding that Union Pacific failed to prove federal funds were used to install
warning devices at the railroad crossing in question.  We further conclude the trial court
reversibly erred in submitting to the jury the Limmers=
negligence claim based on Union Pacific=s alleged
failure to eliminate sight restrictions along its right‑of‑way
because Texas law does not recognize this claim.  Accordingly, we reverse the trial court=s
judgment and remand this case to the trial court for a new trial consistent
with this opinion.

                              I.  Factual
and Procedural Background








On April 24, 1994, a train struck
and killed Billy Limmer when he attempted to cross railroad tracks[1]
at the Front Street grade crossing in Thorndale, Texas (AFront
Street Crossing@).  When this accident occurred, Georgetown
Railroad Company owned this train, and Southern Pacific Railroad Company (ASouthern
Pacific@)
operated it.  Furthermore, at the time of
this accident, Union Pacific owned the railroad tracks in question.  At the time of the accident, the Front Street
Crossing did not have automatic warning devices, which activate when a train
approaches the crossing; rather, it had passive warning devices, including what
are referred to as Acrossbuck@ signsCthe
familiar, white, X-shaped signs with black letters spelling out, ARAILROAD
CROSSING.@ 
There was testimony at trial that trees and vegetation in the area of
the crossing obscured visibility along the tracks at the time of the
accident.  Also, further down the track,
there was a pile of crushed limestone to be used for construction work.








Billy Limmer=s heirs,
the Limmers, sued Union Pacific for negligence. 
The jury found that the Front Street Crossing was Aextra-hazardous@
(Question 1),[2]
that Union Pacific=s negligence
in failing to provide automatic signals, a flag man, Aand/or@ a stop
sign was a proximate cause of the collision (Question 2),[3]
and that Union Pacific=s
negligence in failing to eliminate sight restrictions caused by the limestone
pile Aand/or@ the vegetation
was a proximate cause of the collision (Question 3).[4]  The jury found that Billy Limmer=s
negligence was also a proximate cause of the accident, and it assigned
proportionate responsibility for the collision at eighty-five percent to Union
Pacific and fifteen percent to Billy Limmer. 
The jury returned separate compensatory damage awards for each of the
Limmers.  In its judgment, the trial
court applied the proportionate-responsibility percentage to the jury=s damage
findings and awarded the Limmers a total amount of $8,733,458.70 plus
postjudgment interest.

II.  Issues Presented

On appeal, Union Pacific presents
the following issues for review:

(1)       Did the trial court err in rejecting
Union Pacific=s preemption defense
because Union Pacific conclusively proved as a matter of law that federal funds
were expended to install warning devices at the Front Street Crossing, or,
alternatively, is the trial court=s implied finding that
this did not occur against the great weight and preponderance of the evidence?

(2)       Did the trial court reversibly err by
submitting Union Pacific=s alleged failure to
eliminate sight restrictions as an independent basis of liability?

(3)       Did the trial court err by refusing to
instruct the jury as to the statutory duty of care owed concerning visual
obstructions at public grade crossings?

(4)       Did the trial court err in awarding prejudgment and
postjudgment interest based on delays that were not Union Pacific=s fault?

                                                  III. 
Standards of Review








In the trial court, Union Pacific
asserted the affirmative defense that certain federal regulations preempt all
of the Limmers= claims in this case because
federal funds were expended to install warning devices at the Front Street
Crossing.  Before we can determine the
proper standard of review regarding this issue, we must determine whether it
was tried to the bench or to the jury. 
The record is silent as to whether the parties agreed that this
preemption issue would be tried to the bench rather than to the jury.  Although the Limmers demanded a jury trial
and paid the jury fee, the jury never heard any of the evidence or argument on
the fact issue of whether federal funds were expended to install warning
devices at the Front Street Crossing. 
The trial court admitted the documentary evidence regarding this issue
for the court only, and the trial court heard the testimony on this issue
outside the presence of the jury during the trial.  The trial court did not mention this fact
issue in the jury charge.  The trial
court stated several times that it, rather than the jury, would determine the
preemption issue.[5]  No party objected to this procedure or
indicated to the trial court that it was standing on its right to a jury trial.[6]  On appeal, the Limmers do not assert that
this preemption issue had to be tried to the jury or that Union Pacific waived
its preemption defense by not having its preemption proof admitted in evidence
before the jury.  On this record, we
conclude Union Pacific and the Limmers waived any right they had to have the
jury decide whether federal funds were expended to install warning devices at
the Front Street Crossing.  See Massey
v. Galvan, 822 S.W.2d 309, 318B19 (Tex.
App.CHouston
[14th Dist.] 1992, writ denied) (stating that a party who has paid the jury fee
and properly requested a jury waives its right to a jury trial by proceeding
with a trial to the bench); Sunwest Reliance Acquisitions Group, Inc. v.
Provident Nat. Assur. Co., 875 S.W.2d 385, 386B88 (Tex.
App.CDallas
1993, no writ) (holding that party waived right to jury trial by allowing the
trial court to conduct a bench trial without objecting or indicating to the
trial court that it was standing on its perfected right to a jury trial).








Although the trial court filed no
findings of fact or conclusions of law regarding the preemption issue, on
appeal, we presume the trial court made all findings in favor of its
judgment.  See Pharo v. Chambers Cty.,
922 S.W.2d 945, 948 (Tex. 1996) (stating that, in a bench trial in which the
trial court does not file findings of fact or conclusions of law, appellate
courts presume the trial court made all findings in support of its
judgment).  Because a complete reporter=s record
is a part of the appellate record in this case, Union Pacific may challenge
both the legal and factual sufficiency of the trial court=s
findings.  See Roberson v. Robinson,
768 S.W.2d 280, 281 (Tex. 1989).  We
apply the same standards of review to these challenges as those applied in the
review of jury findings.  See id.  

In its first issue, Union Pacific
attacks the legal sufficiency and factually sufficiency of the evidence to
support the trial court=s implied
finding that Union Pacific failed to prove federal funds were expended to
install warning devices at the Front Street Crossing.  This finding relates to Union Pacific=s
preemption defense, an issue on which Union Pacific had the burden of
proof.  Therefore, for Union Pacific to
succeed in its legal-sufficiency challenge, we must conclude  that Union Pacific conclusively proved its
preemption defense as a matter of law.  See
Dow Chemical Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001).  In making this determination, we must
consider the evidence in the light most favorable to the challenged finding and
indulge every reasonable inference that would support it. See City of Keller
v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005). 
We must credit favorable evidence if a reasonable factfinder could and
disregard contrary evidence unless a reasonable factfinder could not.  See id. at 827.  We must determine whether the evidence at
trial would enable a reasonable and fair-minded person to find the facts at
issue.  See id.  The factfinder is the sole judge of the
credibility of the witnesses and the weight to give their testimony.  See id. at 819.  Evidence is conclusive only if reasonable
people could not differ in their conclusions. 
See id. at 819.  








As to Union Pacific=s factual-sufficiency challenge, we
examine the entire record, considering both the evidence in favor of, and
contrary to, the challenged finding.  Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). 
After considering and weighing all the evidence, we set aside the fact
finding only if it is so contrary to the overwhelming weight of the evidence as
to be clearly wrong and unjust.  Pool
v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986).  The trier of fact is the sole judge of the
credibility of the witnesses and the weight to be given to their
testimony.  GTE Mobilnet of S. Tex. v.
Pascouet, 61 S.W.3d 599, 615B16 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied).  We may not substitute our own
judgment for that of the trier of fact, even if we would reach a different
answer on the evidence.  Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998).  The amount of evidence necessary to affirm a
judgment is far less than that necessary to reverse a judgment.  Pascouet, 61 S.W.3d at 616. 

Union Pacific argues this court
should review the trial court=s
rejection of its preemption arguments completely under a de novo standard of
review because it claims preemption affects the trial court=s subject
matter jurisdiction.  Under the federal
system, once a state establishes certain courts as courts of general
jurisdictionCsuch as the district court belowCit is
presumed that these courts have the power to adjudicate claims under federal
statutes unless otherwise provided by state or federal law.[7]  See U.S.
Const. art.  VI, cl. 2; Tex. Const. art. V, ' 8; Tex. Gov=t Code '' 24.007,
24.008; Howlett v. Rose, 496 U.S. 356, 367B69, 110
S. Ct. 2430, 2438B39, 110
L. Ed. 2d 332 (1990); Dubai Petroleum Co. v. Kazi, 12 S.W.3d 71, 75
(Tex. 2000).  The statutes and regulations at issue
in this case do not contain exclusive-jurisdiction provisions.  See 23 U.S.C. ' 130
(2002); 49 U.S.C. '' 20101B20153
(1997 & Supp. 2003); 23 C.F.R. '
646.214(b) (1999).  No party has cited, and we have not
found, anything in state or federal law that would deprive the trial court
below of subject matter jurisdiction over the Limmers= claims in this case.  








Ordinarily, preemption operates as an affirmative defense to
a claimant=s state law claims but does not
deprive state courts of jurisdiction over those claims.  Mills v. Warner Lambert Co., 157
S.W.3d 424, 425 (Tex. 2005).  After
reviewing the statutes and regulations at issue, we conclude that there is
nothing to rebut the presumption of concurrent jurisdiction and that Union
Pacific=s preemption argument is not based on
one of the few statutes that require claims to be resolved exclusively in a
federal forum.  See Mills,
157 S.W.3d at 425B28 (holding that Federal Food, Drug, and Cosmetic Act did not
deprive state courts of jurisdiction, even if it were to provide defendants
with an affirmative defense barring plaintiffs= claims, because that statute did not
contain an exclusive-jurisdiction provision as does the Employee Retirement
Income Security Act and there was no indication of a Congressional intent
contrary to the presumption of concurrent jurisdiction as with the National
Labor Relations Act); Smallwood v. Ill. Cent. R. Co., 385 F.3d 568, 575B76 (5th Cir. 2004) (en banc) (noting
that, in case involving state law negligence suit based on accident at railroad
crossing, defendant railroad company could not remove case under
federal-question jurisdiction because defendant=s preemption argument was only a
defense and indicating that this defense would bar claims rather than deprive
state court of jurisdiction).

                                                                 IV. 
Analysis

A.        Is the evidence legally and factually sufficient to support
the trial court=s implied
finding that Union Pacific failed to prove federal funds were expended to
install warning devices at the Front Street Crossing under the 1977 Program?








In its first issue, Union Pacific
asserts the evidence is legally and factually insufficient to support the trial
court=s implied
finding that federal regulations concerning warning devices at public grade
crossings do not preempt the Limmers= state
law claims.  See Norfolk S. Ry. Co. v.
Shanklin, 529 U.S. 344, 347B558, 120
S. Ct. 1467, 1470B76, 146
L. Ed. 2d 374 (2000).  As to this
preemption issue, Union Pacific relies on two different programs: (1) a 1977
program that sought to make sure that all public grade crossings in Texas
complied with the minimum standard of the Manual on Uniform Traffic Control
Devices (referred to herein as the A1977 Program@), and
(2) a 1989 program to add retroreflectorized tape to the back of crossbuck
signs and to their support posts (referred to herein as the A1989
Program@).          Under
the Supremacy Clause of the United States Constitution, federal law preempts
state law when it conflicts with or frustrates federal law.  U.S.
Const. art. VI, cl. 2; CSX Transp., Inc. v. Easterwood, 507 U.S.
658, 663, 113 S. Ct. 1732, 1737, 123 L. Ed. 2d 387 (1993).  However, when a subject is traditionally
governed by state law, a court interpreting a federal statute covering the same
subject should be reluctant to find preemption unless it is Athe clear
and manifest purpose of Congress.@  Id., 507 U. S. at 663B64, 113
S. Ct. at 1737 (quotations omitted).  If
the federal statute at issue contains an express preemption clause, then the
analysis must focus on the plain meaning of the clause.  Id.

In 1970, Congress passed the
Federal Railroad Safety Act for the purpose of promoting Asafety in
every area of railroad operations and [to] reduce railroad-related accidents.@  49 U.S.C. ' 20101
(1997).[8]  This statute authorizes the Secretary of
Transportation to implement regulations regarding railroad safety.  See id. ' 20103(a)
(Supp. 2003).  It also contains an
express preemption clause:

Laws, regulations, and
orders related to railroad safety . . . shall be nationally uniform to the
extent practicable.  A State may adopt or
continue in force a law, regulation, or order related to railroad safety . . .
until the Secretary of Transportation . . . prescribes a regulation or issues
an order covering the subject matter of the State requirement.  A State may adopt or continue in force an
additional or more stringent law, regulation, or order related to railroad
safety . . . when the law, regulation or orderC 

(1) is necessary to
eliminate or reduce an essentially local safety . . . hazard;

(2) is not incompatible
with a law, regulation or order of the United States Government; and 

(3) does not unreasonably burden interstate
commerce.

Id. ' 20106
(1997 & Supp. 2003).








In 1973, Congress passed the
Highway Safety Act, which created the Federal Highway Crossings Program and
made funds available to states for the Aconstruction
of projects for the elimination of hazards of railway-highway crossings.@  23 U.S.C. ' 130(a)
(2002).  To participate in the program,
states were required to Aconduct
and systematically maintain a survey of all highways to identify those railroad
crossings which may require separation, relocation, or protective devices, and
establish and implement a schedule of projects for this purpose.@  Id. '
130(d).  The projects had to include, at
a minimum, signs for all railway crossings. 
Id.  The Secretary of
Transportation, through the Federal Highway Administration, promulgated various
regulations implementing the crossings program. 
The rules found at 23 C.F.R. '
646.214(b) (1999) specifically address the design of grade crossing
improvements, and subsections (3) and (4) of that provision address the
adequacy of warning devices installed under the crossings program.

In Easterwood, the United
States Supreme Court held that, when sections 646.214(b)(3) and (4) apply,
federal law preempts state tort law.  See
Easterwood,  507 U. S. at 670B71, 113
S. Ct. at 1741.  The Court reasoned that
these regulations displace state and private decision-making authority by
specifying the devices to be installed and the means by which railroads are to
participate in their selection.  Id.  

In Shanklin, the Court
held that the applicability of these regulations to any given railroad crossing
does not depend on Aan
individualized determination of adequacy@ by a
diagnostic team or federal officials; rather, the regulations apply to all
crossings at which warning devices are installed using federal funds.  See Shanklin, 529 U.S. at 357, 120 S.
Ct. at 1476.  The Court explained that it
is the displacement of State law by the use of federal funds to install warning
devices that has preemptive effect, not whether the installation of devices at
a particular crossing meets the regulatory standards.  See Shanklin, 529 U.S. at 357B58, 120
S. Ct. at 1476.  Because of this standard,
we imply a finding by the trial court that Union Pacific failed to prove
federal funds were expended to install warning devices at the Front Street
Crossing under the 1977 Program.  See
id; Pharo, 922 S.W.2d at 948. 









Union Pacific asserts there is
legally and factually insufficient evidence to support this finding.  The evidence before the trial court relevant
to this issue consists of testimony from Wayne Heathington, Douglas Woods, and
Darin Kosmak.

The trial court admitted in
evidence (before the court only) an affidavit of Darin Kosmak, the Railroad
Liaison Manager in the Traffic Operations Division of the Texas Department of
Transportation (the ADepartment@).  In this affidavit, Kosmak testifies as
follows:

[Kosmak] . . . by virtue
of [his] position at the [Department] [is] personally familiar with the matters
stated [in his affidavit]. . . .

In 1977 the [Department]
implemented a program to improve all unsignalized public grade crossings in
Texas.  Between 1977 and 1981 the State
of Texas received Federal Highway Funding in order to implement this program.

Pursuant to Section 203 of
the Federal-Aid Highway Act of 1976, all crossbuck protected crossings on the
Missouri Pacific Railroad Company=s road crossing received
the benefit of Federal Funds between approximately 1977 and 1981.  These funds were expensed to either install
or upgrade crossing protection at all crossbuck-protected crossings to
consisted [sic] of two (2) reflectorized crossbucks.  As evidenced by the attached Exhibit Pages
Nos. 1-2, The Missouri Pacific Railroad Company agreed to participate in this
program.  As evidenced by Exhibit Page
No. 3, the letting date for the contract to install metal crossbuck poles and
signs for District 17, which include[s] [the 
Front Street Crossing] was December 1977.  The contract price, which was a 100%
Federally-funded project, for District 17 was $395,069.26.

Under
this program, the Secretary of Transportation determined the type of warning
devices to be installed at [the Front Street Crossing]; determined [sic] the
means by which The Missouri Pacific Railroad Company participated in the
selection; and also allocated Federal Funds [sic] for said installation.

Darin Kosmak testified before the
court as follows:

!         It is Kosmak=s understanding that certain documents relating to
the 1977 Program that were kept by the State of Texas have been discarded,
before Kosmak=s employment with the
Texas Department of Transportation. 
Kosmak assumes this occurred in the 1980s.








!         Kosmak has attached to his affidavit the documents that he
does have in connection with the 1977 Program. 


In deposition testimony admitted
before the court, Darin Kosmak testified as follows:

!         Kosmak cannot not say how much money, if any, was actually
spent on putting crossbucks or poles or signs or replacing crossbucks or poles
or signs under the 1977 Program at the Front Street Crossing.  Kosmak=s affidavit does not
contain any evidence specific to the Front Street Crossing regarding the
expenditure of federal or state funds on that crossing under the 1977
Program.  Kosmak does not know how much
federal or state money, if any, was spent at the Front Street Crossing as a
result of the 1977 Program.  

!         It was the State of Texas that made the decision to do
whatever was done at the Front Street Crossing as a result of the 1977 Program,
if anything. 

!         Kosmak does not know whether anything actually occurred at
the Front Street Crossing as a result of the 1977 Program.

!         Under the 1977 Program, the State of Texas would have the
work done and then the federal government would reimburse the State.  

Wayne Heathington, an expert
retained by the Limmers, testified before the court as follows:

!         As Heathington understands it, Darin Kosmak of the Texas
Department of Transportation did not confirm, based on his own personal
knowledge, whether federal funds had been spent to install any type of
crossbuck warning device at the Front Street Crossing before Billy Limmer=s fatal collision.

!         The 1977 Program was federally funded and approved by the
Federal Highway Administration.

!         Based on his examination of a photograph of the crossbuck
signs at the Front Street Crossing, Heathington believes that the crossbuck
signs either were never put in under the 1977 Program or were put in under the
1977 Program but not maintained.  

Douglas Woods testified before the court as follows:

!         He has seen the metal reflectorized crossbuck blades that
have been used under the 1977 Program.








!         The crossbuck blades shown in a picture of the Front Street
Crossing appear to Woods to be the same type of blades.  The crossbuck blades shown in a picture of
the Front Street Crossing look the same as ones that Woods has seen
before.  

!         Woods is not aware of any Union Pacific program to put in
metal reflectorized crossbuck blades.

A December 21, 1976 letter from
the Department to Missouri Pacific Railroad Company (hereinafter AMissouri
Pacific@) states
as follows:

[The Department is]
developing a project [the 1977 Program] in cooperation with the Federal Highway
Administration utilizing Safety Funds under section 203 of the Federal-Aid
Highway Act of 1976 to install passive warning devices at all public road
crossings of all railway lines in the State of Texas.  This project is designed to bring each
crossing up to the minimum standard as specified in the Manual on Uniform
Traffic Control Devices.

Generally, the work
performed on your right of way will be the installation or upgrading of
reflectorized crossbuck and number-of-track signs and placement of pavement
markings and stop lines on the pavement surface, part of which may be on your
right of way. . . We propose to utilize all of the existing crossbuck signs and
mountings as appropriate.  Where new
material is installed the State will salvage and dispose of the existing signs,
without credit to your company.  

. . .

By
signing and returning one copy of this letter, you grant your company=s permission
for the State or its Agent to perform the work herein described as may be
necessary to provide a minimum passive warning system at public highway or road
crossings on your rail system in Texas.

Union Pacific asserts it conclusively
proved that federal funds were expended to install warning devices at the Front
Street Crossing under the 1977 Program. 
Union Pacific bases this assertion on the following evidence: (1) Kosmak=s
affidavit and portions of Kosmak=s
deposition testimony; (2) the December 21, 1976 letter, (3) Woods=s
testimony before the trial court; (4) Heathington=s
testimony to the bench.








Kosmak was not involved in the
1977 Program, and he testified at his deposition that he does not know whether
anything actually occurred at the Front Street Crossing as a result of the 1977
Program or whether any federal or state money was spent at the Front Street
Crossing under the 1977 Program.[9]  

Although the first sentence of
the 1976 letter could be construed as meaning that the 1977 Program installed
passive warning devices at all public road crossings in Texas, it also could
reasonably be construed to mean that the 1977 Program only made sure that all
public road crossings in Texas had sufficient passive warning devices.  This latter interpretation is supported by
the second sentence which indicates that the goal of the 1977 Program was for
each crossing to conform to the minimum standard specified in the Manual on
Uniform Traffic Control Devices (hereinafter the AManual@).  The letter states that, generally,
reflectorized crossbucks will be installed or upgraded.  The letter, however, also says that existing
crossbuck signs and mountings will be used, as appropriate.  The letter states that, A[w]here
new material is installed the State will salvage and dispose of the existing
signs,@
indicating that new material will not necessarily be installed at each crossing.  Finally, 
by signing the letter, Missouri Pacific gave its Apermission
for the State or its Agent to perform the work herein described as may be
necessary.@ 
This sentence indicates that work may not be necessary at each
crossing.  








Union Pacific also relies on
Heathington=s testimony that (1) the front of
the crossbuck signs under the 1977 Program were reflectorized, like the
crossbuck signs at the Front Street Crossing; (2) the 1977 Program was
federally funded; and (3) federal funds were spent on the Front Street Crossing
if the reflectorized crossbuck signs at that crossing were installed under the
1977 Program.  This testimony does not
address the issue at handCwhether
federal funds were expended under the 1977 Program to install warning devices
at the Front Street Crossing. 
Furthermore, Heathington also testified that, based on his examination
of a photograph of the crossbuck signs at the Front Street Crossing,
Heathington believes that the crossbuck signs at the Front Street Crossing
either were never put in under the 1977 Program or were put in under the 1977
Program but not maintained.








Woods, Union Pacific=s Manager
of Industries and Public Projects and a longtime Union Pacific employee, did
testify that the crossbuck signs shown in a picture of the Front Street
Crossing appear to Woods to be the same type of signs as those that were used
under the 1977 Program.[10]  But, Woods was an interested witness.  Testimony from interested witnesses may
establish a fact as a matter of law only if the testimony could be readily
contradicted if untrue, and is clear, direct, and positive, and there are no
circumstances tending to discredit or impeach it.  See Lofton v. Texas Brine Corp., 777
S.W.2d 384, 386 (Tex. 1989); see also City of Keller v. Wilson, 168
S.W.3d 802, 820 (Tex. 2005) (stating that the factfinder cannot ignore
undisputed testimony that is clear, positive, direct, otherwise credible, free
from contradictions and inconsistencies, and could have been readily
controverted).  Woods did not testify
that any warning devices were installed at the Front Street Crossing under the
1977 Program.  The record does not
reflect that Woods would be in a position to have personal knowledge as to this
issue.  Woods simply testified the
crossbuck signs at the Front Street Crossing Aappear to
be the same@ and Alook the
same@ as other
crossbuck signs that he has seen that were installed under the 1977
Program.  Woods=s
testimony on this point is not clear, direct, and positive.

Furthermore, there are
circumstances tending to discredit or impeach Woods=s
testimony.  On the same day that he gave
the testimony relied on by Union Pacific, Woods testified in front of the trial
court and the jury that, in all his time with Union Pacific and in all his time
as a driver, having driven in at least eighteen states, he has never seen a
railroad crossing that he considered extrahazardous.  Woods also testified that he had never seen a
crossing that needed to have lights and gates not to be extrahazardous.  Woods stated that in all his travels, both
working for Union Pacific and personally as a motorist, he has never on any
occasion ever seen a public grade crossing that had only crossbuck signs that
he believed required the installation of automatic lights and gates to make the
crossing safe enough for an ordinarily prudent person to cross it safely.  On the previous day, Woods testified that he
had been involved in between four hundred and five hundred upgrades of warning
systems at Union Pacific crossings. 
Woods also testified that automatic lights and gates at railroad
crossings do not provide additional protection for motorists against having a
train/motor vehicle collision.[11]  Presuming for the sake of argument that Woods=s
testimony regarding the 1977 Program was uncontroverted,[12]
it still does not satisfy the standard required for interested-witness
testimony to be conclusive, and reasonable people could differ in their
conclusions based on it.  See Lofton,
777 S.W.2d at 386B87
(holding that testimony by interested witness did not establish fact as a
matter of law because of circumstances tending to impeach it); Gevinson v.
Manhattan Const. Co. of Ok., 449 S.W.2d 458, 467B68 (Tex.
1969) (holding testimony from interested witness did not conclusively prove
reliance because there were circumstances tending to discredit or impeach that
testimony).  













After carefully reviewing the
record under the applicable standard of review, we conclude Union Pacific did
not conclusively prove that federal funds were expended to install warning
devices at the Front Street Crossing under the 1977 Program.[13]  See Duncan v. Kansas City S. Ry. Co.,
773 So.2d 670, 679B80 (La.
2000) (holding that evidence was sufficient to support trial court=s finding
that railroad company failed to prove federal funds were expended to install
warning devices at the railroad crossing in question because, even though there
was a program using federal funds to install warning devices in the parish
where the crossing was located, a letter in evidence stated that existing
crossbuck signs would remain in place and there was no evidence as to whether the
crossing in question had existing crossbuck signs before the project).  Recognizing the trial court=s role in
this case as factfinder regarding the preemption issue and applying the
factual-sufficiency standard of review, we conclude that the evidence is
factually sufficient to support the trial court=s implied
finding that Union Pacific failed to prove federal funds were expended to
install a warning device at the Front Street Crossing under the 1977
Program.  Therefore, the trial court did
not err in rejecting Union Pacific=s
preemption defense based on the 1977 Program. See Shanklin, 529 U.S. at
357, 120 S. Ct. at 1476. 

B.        Did the trial court err in impliedly
rejecting Union Pacific=s preemption defense as to the 1989 Program
because adding retroreflectorized tape to the back of crossbuck signs and their
supporting pole does not constitute the installation of a warning device?

The two poles that bear the crossbuck signs at the Front Street
Crossing each have a band of retroreflectorized tape affixed to the pole
beneath the sign, and the back sides of the crossbuck signs themselves, which
contain no words or warnings, have retroreflectorized tape attached to them (we
refer collectively to this tape hereinafter as the ATape@). 
Union Pacific asserts it conclusively proved that federal funds were
expended to install the Tape and that the Tape constitutes a warning device.  In the alternative, Union Pacific asserts
there is factually insufficient evidence to support the trial court=s implied findings to the
contrary.  The Limmers assert that
legally and factually sufficient evidence supports these implied findings.  The Limmers also assert that sufficient
evidence supports the trial court=s implied finding that the Tape was
not installed during the 1989 Program. 
However, for the purposes of this analysis, we presume without deciding
that the Tape was installed at the Front Street Crossing under the 1989 Program
and that federal funds were expended on this installation.[14]


As part of its burden of proving
its preemption defense, Union Pacific had to show that the Tape is a warning
device.  See 23 C.F.R. '
646.214(b); Shanklin, 529 U.S. at 352B53, 120
S. Ct. at 1473B74; Easterwood, 507 U.S.
at 672, 113 S. Ct. at 1741.  The United States Supreme Court
has stated that, in making this determination, the proper inquiry is to see if
the installed item meets the definition of warning device by being either an
active warning device or a passive warning device as defined below:








Active Warning Devices
means those traffic control devices activated by the approach or presence of a
train, such as flashing light signals, automatic gates and similar devices, as
well as manually operated devices and crossing watchmen, all of which display
to motorists positive warning of the approach or presence of a train.

Passive Warning Devices
means those types of traffic control devices, including signs, markings and
other devices, located at or in advance of grade crossings to indicate the
presence of a crossing but which do not change aspect upon the approach or
presence of a train.

23 C.F.R. ' 646.204;
see Easterwood, 507 U.S. at 672B73 &
n.11, 113 S. Ct. at 1741B42 &
n.11 (stating that installed item must meet the definition of warning device by
being either an active
warning device or a passive warning device as defined in 23
C.F.R. ' 646.204
and holding that motion-detection circuitry intended to be used with automatic
gate at railroad crossing did not meet this definition of warning device).  No party contends that the Tape is an active
warning device under the above definition, and there is no evidence showing
that it is.  Therefore, under United
States Supreme Court precedent, the issue in this case is not whether the Tape
is a Awarning
device@ under
the ordinary meaning of that word; rather, the issue is whether the Tape
constitutes a passive warning device as defined above.  See Easterwood, 507 U.S. at 672B73 &
n.11, 113 S. Ct. at 1741B42 &
n.11; 23 C.F.R. ' 646.204.









To qualify as a passive warning
device, the Tape must be a Atraffic
control device[] . . . located at or in advance of [the Front Street Crossing]
to indicate the presence of a crossing.@  See 23 C.F.R. '
646.204.  The definition of warning
device is a matter of law that has been established under precedent from the
United States Supreme Court.  One might
therefore conclude we should determine, as a matter of law,  whether any retroreflectorized tape
could be a warning device under this definition or whether retroreflectorized
tape installed in the 1989 Program can be such a warning device.  Based on the legal definition that we must
apply and based on the information that we have in the record before us
regarding the Tape and the 1989 Program, we conclude that we are not in a
position to determine these broader issues. 
Therefore, we limit our analysis to the particular tape affixed to the
crossbuck signs and supporting poles at the Front Street Crossing.[15]  Under the applicable legal standard, this
Tape must (1) be a traffic control device, and (2) indicate the presence of a
railroad crossing. See Easterwood, 507 U.S. at 672B73 &
n.11, 113 S. Ct. at 1741B42 &
n.11.  The trial court heard the
following evidence regarding these issues from the Limmers= expert,
Wayne Heathington:

!         Heathington is familiar with the 1989 Program to add
retroreflectorized tape to crossbuck signs to increase visibility at night.[16]  

!         The United States Department of Transportation publishes the
Manual.  Nowhere in the Manual does it
list or classify or describe retroreflectorized tape as a traffic control
device.  

!         The Manual states that it presents traffic control device
standards for all streets and highways open to public travel regardless of the
type or class or the governmental agency having jurisdiction.

!         Nowhere in the Manual does it define retroreflectorized tape
as a traffic control device.  

!         A traffic control device has to provide information or tell
the motorist something to do.  The Tape
reflects light so something becomes more visible and more easily seen, but the
Tape has nothing to do with telling motorists to stop, to look, to observe, to
turn right or to not turn right or anything of that nature. The Tape does not
serve the function of a traffic control device. 









!         Heathington contacted the Federal Highway Administration and
asked who was in charge of the Manual committee and he was told the person was
Shelley Row.  He then sent a letter to
Ms. Row asking if the use of retroreflectorized tape on traffic sign posts and
on the back of crossbuck signs is considered a traffic control device.  Ms. Row responded by writing a letter as
Director of the Office of Transportation Operations for the Federal Highway
Administration.  In this letter, Ms. Row
stated that retroreflectorized tape is not considered a traffic control device.

!         In enacting House Bill 2681 in 1989 (a copy of which is
contained in Plaintiffs= Exhibit 110), the Texas
Legislature defined an active warning device or crossbucks differently than
retroreflectorized tape.  The Texas
Legislature made a distinction between retroreflectorized material and an
active warning device or a crossbuck.[17]

!         Heathington=s opinion that retroreflectorized tape cannot be
considered a traffic control device is supported by House Bill 2681, which
states that the State Department of Highways and Public Transportation Ashall develop guidelines
and specifications for the installation and maintenance of retroreflectorized
material at all public grade crossings not protected by active warning devices.@  

!         H.B. 2681 defines retroreflectorized tape separately from Awarning device.@ Retroreflectorized tape
is not considered to be a warning device. 
H.B. 2681 defines ARetroreflectorized
material@ as Amaterial that reflects
light so that the paths of the reflected light rays are parallel to those of
the incident rays.@ H.B. 2681 defines AActive warning device@ as Aa bell, flashing light,
gate, wigwag, or other automatically activated warning device.@  H.B. 2681 defines AWarning device@ as Aan active warning device,
crossbuck, or other a traffic control sign, the purpose of which is to alert
motorists of a grade crossing.@

!         Heathington=s opinion
is also supported by article 6370b of the Texas Revised Civil Statutes, which
was admitted before the trial court and which codifies H.B. 2861.

Union Pacific has not cited any evidence that
it introduced as to this issue, and we have found none.  








1.         Is the evidence
sufficient to support the trial court=s implied
finding that Union Pacific failed to prove that the Tape is a traffic control
device?

Under the
applicable legal standard, to be a warning device, the Tape must be a traffic
control device.  See id.  The regulations at issue do not define
what a traffic control device is; however, they require that all traffic
control devices comply with the latest edition of the Manual.  The Manual states that the purpose of Atraffic
control devices@ is Ato help
insure highway safety by providing for the orderly and predictable movement of
all traffic . . . throughout the national highway transportation system, and to
provide such guidance and warnings as are needed to insure the safe and
informed operation of individual elements of the traffic stream.@








The evidence from Heathington,
which we presume the trial court credited, showed that the Tape is designed to
make the crossbuck signs more easily visible to motorists at night and that it
is not designed to control traffic.  We
have found no published cases dealing with the issue of whether the addition of
retroreflectorized tape constitutes the installation of a warning device.[18]  Furthermore, we note the conceptual
difficulty of analyzing the function of the installed itemCthe TapeCapart
from the warning device to which it was affixedCthe
crossbuck signs.[19]  While a crossbuck sign with
retroreflectorized tape would be a traffic control device, the 1989 Program did
not involve the installation of crossbuck signs.  The testimony of Heathington and the
photographs of the Tape in the record show that, although the Tape may increase
the nighttime visibility of the crossbuck signs to which it is attached, the
Tape, by itself, does not provide guidance or warnings to motorists.  After carefully reviewing the record under
the applicable standard of review, we conclude Union Pacific did not
conclusively prove that the Tape is a traffic control device.  See Enriquez v. Union Pac. R. Co., No.
5:03CV174, p. 23B25 (E.D.
Tex. Dec. 30, 2004) (holding by Judge Folsom that Union Pacific did not prove
its entitlement to summary judgment, in part, because evidence did not
conclusively prove that installation of retroreflectorized tape in 1989 Program
was the installation of a traffic control device or of a warning device) (not
designated for publication); Lesly v. Union Pac. R. Co., No. H-03-0772,
U.S. Dist. LEXIS 23018, at *11B12 (June
25, 2004) (holding by Judge Lake that Union Pacific did not prove its
entitlement to summary judgment, in part, because evidence did not conclusively
prove that installation of retroreflectorized tape in 1989 Program was the
installation of a warning device) (not designated for publication).  Applying the factual-sufficiency standard of
review, we conclude that the evidence is factually sufficient to support the
trial court=s implied finding that Union
Pacific failed to prove that the Tape is a traffic control device. 

2.         Is the evidence sufficient to support the trial court=s implied
finding that Union Pacific failed to prove that the Tape indicates the presence
of a railroad crossing?








In holding that evidence did not
show that motion-detection circuitry intended to be used with an automatic gate
at a railroad crossing was a warning device, the United States Supreme Court
emphasized that, to meet the applicable definition of warning device, the
installed item must indicate the presence of a railroad crossing.  See Easterwood, 507 U.S. at 672B73 n.11,
113 S. Ct. at 1741B42
n.11.  The testimony of Heathington and
the photographs of the Tape in our record show that Union Pacific did not
conclusively prove that the Tape, by itself, indicates the presence of a
railroad crossing.  Based on this
evidence, reasonable people could differ in their conclusions as to whether the
Tape indicates the presence of the crossbuck signs rather than indicating the
presence of a railroad crossing.  After
carefully reviewing the record under the applicable standard of review, we
conclude that Union Pacific did not conclusively prove that the Tape indicates
the presence of a railroad crossing.  See
Enriquez, No. 5:03CV174, p. 23B25; Lesly,
No. H-03-0772, U.S. Dist. LEXIS 23018, at *11B12.  Applying the factual-sufficiency standard of
review, we conclude that the evidence is factually sufficient to support the
trial court=s implied finding that Union
Pacific failed to prove that the Tape indicates the presence of a railroad
crossing.

Because sufficient evidence supports the trial court=s implied findings that
Union Pacific did not prove that the Tape is a traffic control device and that
the Tape indicates the presence of a railroad crossing, we conclude the trial
court did not err in rejecting Union Pacific=s preemption defense based
on the 1989 Program.[20]  See Shanklin, 529 U.S. at 357, 120 S.
Ct. at 1476; Easterwood, 507 U.S. at 672B73, 113 S. Ct. at 1741B42.  Having found that Union Pacific=s preemption issue lack
merits as to both the 1977 Program and the 1989 Program, we overrule the first
issue.[21]


 

C.        Does Union Pacific=s alleged negligence in
failing to eliminate sight restrictions constitute an independent basis of
liability?

 








In its
second issue, Union Pacific argues that, even if federal law does not preempt
the Limmers= negligence claim in Question 3,
its alleged negligence in failing to eliminate sight restrictions cannot be an
independent basis of liability.  See
supra note 4.  The Limmers assert
that Union Pacific failed to preserve error as to its second issue because it
did not object to the jury question regarding apportionment of
responsibility.  The trial court
overruled Union Pacific=s
objection that Question 3 is not an independent basis of liability.  In an analogous situation (separate liability
questions but a combined apportionment question), the Texas Supreme Court
recently stated that it did not have to address whether the objecting party also
had to object to the apportionment question to preserve error.  See Romero v. KPH Consol., Inc., 166
S.W.3d 212, 229 (Tex. 2005).  In so
stating, the Romero court quoted a federal case that stated in dicta
that such an issue is a Aclose and
difficult question.@ Romero,
166 S.W.3d at 229 n. 55 (quoting Pan Eastern Exploration Co. v. Hufo Oils, 855 F.2d 1106, 1124 (5th Cir.1988)).  The case cited by the Romero court
also states in dicta that A[i]t seems likely that in the case of a potentially ambiguous
general verdict all the complaining party must do to protect his rights is to
object to the charge and the submission vel non of the questionable
theory or theories. . . .@  Pan Eastern
Exploration Co. v. Hufo Oils, 855 F.2d 1106, 1124 (5th Cir.1988); see
Romero, 166 S.W.3d at 229 n.55.  








Union Pacific had to, and did,
object to the trial court=s
submission of Question 3.  See In re
A.V., 113 S.W.3d 355, 362B63 (Tex.
2003) (holding that party failed to preserve any error based on broad-form
submission of a theory without evidentiary support where party did not object
to any theory=s alleged lack of evidentiary
support or to the submission of a broad-form question).  However, the Texas Supreme Court and this
court have held that the Casteel harm analysis applies to charge error
even if the parties did not object to the form of the jury charge.  See Harris County v. Smith, 96 S.W.3d
230, 232, 236 (Tex. 2002) (stating that A[a]
timely objection, plainly informing the court that a specific element of
damages should not be included in a broad-form question because there is no
evidence to support its submission, therefore preserves the error for appellate
review@ and
holding that Casteel harm analysis applied to error in jury question 4,
even though court stated that error was preserved as to this question only by
objecting that there was no evidence to support the submission of one of its
damage elements); Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 387B88 (Tex.
2000) (holding that submitting invalid theories of liability in a single
broad-form jury question is harmful error when it cannot be determined whether
the jury based its verdict on one or more of the invalid theories and holding
that party preserved error by obtaining ruling on its timely objection
asserting the invalidity of the invalid theories); Wal-Mart Stores, Inc. v.
Redding, 56 S.W.3d 141, 150, 156B57 (Tex.
App.CHouston
[14th Dist.] 2001, pet. denied) (holding that party preserved error and was
entitled to Casteel harm analysis where party objected that there was no
evidence to support the submission of one of several damage elements in a
question, despite party=s failure
object to the broad-form nature of the jury question); see also Redding,
56 S.W.3d at 156B57
(Wittig, J., dissenting) (noting that objecting party did not object to form of
charge or argue broad form was not feasible). 


In Romero, the trial court
properly submitted one liability theory to the jury, erroneously submitted
another liability theory to the jury in a separate question, and the jury
answered both liability questions in the affirmative.  See Romero, 166 S.W.3d at 225B29.  In Romero, the court=s charge
used a single question regarding apportionment of responsibility.  See id.  The Romero court held that a Casteel
harm analysis applied in assessing whether the submission of the erroneous
theory was reversible error, although it did not address whether the
complaining party was required to object to the apportionment question.  See id.  Based on the authorities cited above, we
conclude that Union Pacific did not have to object to the apportionment
question to be entitled to a Casteel harm analysis, if we determine that
Union Pacific=s alleged negligence in failing
to eliminate sight restrictions cannot be an independent basis of
liability.  See Smith, 96 S.W.3d
at 232B36; Casteel,
22 S.W.3d at 387B88; Redding,
56 S.W.3d at 156B57.  








To resolve the merits of Union
Pacific=s second
issue, a review of a line of Texas Supreme Court cases from the late nineteenth
century is essential.  First, the Texas
Supreme Court held several times that the failure of a railroad company to
eliminate sight restrictions along its right-of-way does not necessarily
constitute negligence, but that such a failure may serve as an independent
basis of liability, if the fact finder determines it to be negligence after
considering all the facts and circumstances.  See Galveston, H. & S.A. Ry. Co. v.
Michalke, 38 S.W. 31 (Tex. 1896) (upholding ruling by court of civil
appeals that trial court did not err in instructing the jury regarding sight
restrictions and stating whether railroad company=s
permitting of sight restrictions constituted negligence was question for fact
finder), denying writ of error as to Galveston, H. & S.A. Ry. Co. v.
Michalke, 37 S.W. 480 (Tex. Civ. App. 1896) (finding no error in trial
court=s
instruction to jury that A[i]f you
believe from the evidence that defendant permitted restrictions to be placed
and remain upon its track and right-of-way, so as to obstruct the view of
plaintiff in approaching the public crossing in the town of Weimar, and if you
believe such acts, if any, constituted negligence on the part of defendant, and
that they were the proximate cause of plaintiff=s
injuries, and that plaintiff did not by his negligence contribute to his
injuries, then you will find your verdict for the plaintiff@); Receivers
of Houston & T.C. Ry. Co. v. Stewart, 17 S.W. 33 (Tex. 1891) (holding
that there was sufficient evidence to support the trial court=s fact
finding that railroad company committed negligence by placing boxcars on its
side track that obstructed the view of the main track and that such a finding
supports a negligence claim because whether railroad company negligently used
its side track was a question of fact); Dillingham v. Parker, 16 S.W.
335, 335B36 (Tex.
1891) (holding trial court erred in instructing jury that a railroad company
would necessarily be negligent if it allowed cars on its side track to obstruct
the view of the main track near a crossing, because whether such action by the
railroad company constitutes negligence under the facts and circumstances of
the case is a question for the fact finder); Eames v. T. & N.O. Ry. Co.,
63 Tex. 660, 663B65 (Tex.
1885) (holding plaintiff alleged facts that a jury could find to constitute
negligence, in case where plaintiff alleged railroad company negligently
allowed bushes to grow on its right-of-way to the extent that they could
conceal cattle, despite the railroad company=s alleged
knowledge of the presence of free-roaming cattle near the track that might be
obscured from the train operator=s sight
by the bushes).[22]








The Texas Supreme Court again
visited this topic in the Rogers case, in which it held  the trial court erred in instructing the jury
that any failure of the railroad company to eliminate sight restrictions would
necessarily constitute negligence.  See
Missouri, K. & T. Ry. Co. of Texas v. Rogers, 40 S.W. 956, 957B58 (Tex.
1897).  The Rogers court stated
the trial court erroneously charged the jury that the railroad company=s failure
to eliminate sight restrictions alone would necessarily constitute negligence,
regardless of the care with which the railroad company operated its train.  Rogers, 40 S.W. at 957.  Although the Rogers court recognized
its Michalke line of cases, it also cited Cordell, a New York
decision holding that the existence of sight restrictions along a railroad
company=s
right-of-way cannot be an independent basis of liability, although it may be a
circumstance material to the issues of the plaintiff=s alleged
contributory negligence and the railroad company=s alleged
negligence in operating the train.  See
id. at 958 (citing and quoting Cordell v. N.Y. Cent. & Hudson River
Ry. Co., 70 N.Y. 119 (N.Y. 1877)). 
Though the Cordell case is contrary to the Michalke line
of cases, the Rogers court quoted from Cordell=s holding
and stated that the quotation properly states Texas law, subject to a
qualification relating to contributory negligence that is not relevant to the
issues in the case before us.  See id.
at 958.  The Rogers court
stated that the existence of sight restrictions would not give rise to a
negligence claim if the train operator exercised such care in the operation of
its train as a prudent person under similar circumstances, having due regard
for the safety of those traveling on the highway over the railroad, would have
exercised.  See id. at 958.  








While, on the whole, the Rogers
court seems to conclude that sight restrictions are not an independent
basis of liability, there is some language in the opinion that might cloud the
issue.  See id. at 957B58.  After stating that a railroad company=s failure
to eliminate sight restrictions does not necessarily constitute negligence, the
Rogers court notes that it is a question of fact for the jury whether,
under the circumstances, the restriction constitutes negligence and whether,
under the conditions existing at the time, the railroad company exercised due
care in the operation of its train.  See
id.  While this statement may
indicate that sight restrictions are to be considered in determining the train
operator=s
negligence, if any, in operating the train, the statement may indicate to some
that sight restrictions can constitute an independent basis of liability.[23]   

One year later in the Knight
case, the Texas Supreme Court dispelled any confusion as to the meaning of its
opinion in Rogers.  See Int=l &
G. N. Ry. Co. v. Knight, 45 S.W. 556, 557B58 (Tex.
1898).  In Knight, the trial
court, in its general-verdict instructions, instructed the jury it could find
the railroad company liable based solely on its determination that the company=s failure
to eliminate sight restrictions (1) was an act that an ordinary prudent person
would not have committed under like circumstances; (2) was negligence; and (3)
was the proximate cause of the decedent=s death,
without any contributory negligence by the decedent.  Knight, 45 S.W. at 557.  Noting that Rogers had held that sight
restrictions cannot constitute negligence but are merely a matter to be
considered by the fact finder as to whether the operator of the train was
negligent, the court stated that the railroad company=s failure
to eliminate sight restrictions in Knight could not be deemed to be
negligence either in law or in fact.  Id.  The Knight court held that, while the
evidence was sufficient to support a jury finding that the railroad company=s
negligence in operating its train proximately caused the  decedent=s death
without any contributory negligence of the decedent, a new trial was required
because the jury may have found the company liable based solely on its failure
to eliminate sight restrictions under the trial court=s
erroneous jury instructions.  Id.
at 556B57.  Further, the court stated that, under its Rogers
precedent, the presence of sight restrictions was material only to the extent
it might affect the determination of the company=s
negligence in operating its train at the crossing.  Id. at 557B58.  Thus, although the Michalke line of
cases indicated that failure to eliminate sight restrictions could constitute
an independent basis of liability, in Knight, the court held that sight
restrictions could not constitute an independent basis of liability, relying
upon Rogers.  Knight, 45
S.W. at 557B58; Rogers, 40 S.W. at 957B58.  








The Texas Supreme Court has not
revisited this issue in the 107 years since it decided Knight; however,
lower courts applying Knight have held that plaintiffs should take
nothing if their only viable basis for negligence liability against a railroad
company is an alleged failure to eliminate sight restrictions, because such a
failure is not an independent basis of liability.  See Atchison, Topeka & Santa Fe Ry.
Co. v. Rubrecht, 445 S.W.2d 784, 789 (Tex. Civ. App.CFort
Worth 1969, writ ref=d n.r.e.)
(reversing and rendering a take-nothing judgment because, as a matter of law,
speed of train could not have proximately caused plaintiff=s
injuries and because failure of railroad company to eliminate sight restrictions,
though found by the jury to be negligent, cannot constitute an independent
basis of liability under Rogers and Knight); Wichita Falls
& S. R.R. Co. v. Anderson, 144 S.W.2d 441, 443B45 (Tex.
Civ. App.CEastland 1940, writ dism=d judgm=t cor.)
(holding plaintiff could not recover as a matter of law because, among other
things, the failure to eliminate sight restrictions is not a ground of
actionable negligence under Rogers and Knight); Texas & P.
Ry. Co. v. Boyle, 29 S.W.2d 927, 930 (Tex. Civ. App.CEl Paso
1930, writ dism=d)
(reversing and rendering take-nothing judgment because the only ground of
alleged negligence submitted to jury was failure to eliminate sight
restriction, which is not itself negligence under Rogers and Knight);
Texas & N.O. Ry. Co. v. Adams, 27 S.W.2d 331, 335 (Tex. Civ. App.CBeaumont
1930, writ dism=d)
(reversing and rendering a take-nothing judgment because plaintiff=s other
alleged grounds of negligence failed as a matter of law and because failure to
eliminate sight restrictions is not an independent basis of liability under Rogers
and Knight); Galveston, H.& S.A. Ry. Co. v. McCrorey, 23
S.W.2d 691, 692B95 (Tex.
Comm=n App.
1930, judgm=t adopted) (reversing and
rendering take nothing judgment against plaintiff because jury found no
negligence in the operation of the train but only in the railroad company=s failure
to eliminate sight restrictions, which the court concludes is not an
independent basis of liability under Rogers and Knight).  








These courts are correct that
under Rogers and Knight, the Texas Supreme Court has declared
that the failure to eliminate sight restrictions is not an independent basis of
liability.  As an intermediate court of
appeals, this court is bound to follow established precedent from the Texas Supreme
Court.  Consideration of any changes to
common-law rules must be left to that higher authority.  Lubbock County, Tex. v. Trammel=s Lubbock
Bail Bonds, 80 S.W.3d 580, 585 (Tex. 2002); Deutsch v. Hoover, Bax & Slovacek,
L.L.P, 97 S.W.3d 179, 195 (Tex. App.CHouston
[14th Dist.] 2002, no. pet.).[24]  

The Limmers argue that Knight
and Rogers do not apply to the facts before us because Union Pacific did
not operate the train, it merely owned the right-of-way.  In Rogers and Knight, and
those cases cited thus far regarding sight restrictions, the train operator
also owned the right-of-way.  As a matter
of logic, if, as to sight restrictions, a right-of-way owner is not subject to
liability as a right-of-way owner for accidents in which it operates the train,
then there is no apparent reason that an owner should be subject to liability
in its capacity as owner of the same right-of-way for accidents in which
another company operates the train. Presuming that the Limmers timely sued
Southern PacificCthe
operator of the trainCand that
the Limmers have claims that are not preempted by federal law, under Rogers
and Knight, they would be free to seek a determination as to whether
Southern Pacific negligently operated the train at the time of the accident
made the basis of this suit, giving full consideration to the sight restrictions
and other conditions at the time of the accident.  The fact that different companies operate the
train and own the right-of-way does not alter the rationale stated in Rogers
and Knight. 








Research reveals no Texas case
that expressly states Rogers and Knight do not apply to such
circumstances, and the Limmers have not cited any authority from any
jurisdiction indicating the Rogers and Knight rule does not apply
to such circumstances.  Indeed, a court
in AlabamaCwhich has the same common-law
rule as that stated in Rogers and KnightCapplied
that rule to a situation in which the right-of-way owner and train operator
were different companies.  See Nat=l Ry.
Passenger Corp. v. H & P, Inc., 949 F. Supp. 1556, 1564B65 (M.D.
Ala. 1996) (applying rule of law from Alabama Great S. Ry. Co. v. Johnston,
199 So.2d 840, 843B44 (Ala.
1967), that there is no independent negligence claim for failure to eliminate
sight restrictions along the right-of-way, to fact pattern in which
right-of-way owner and train operator were different companies).  In sum, this attempt to distinguish Rogers
and Knight is unpersuasive.








The Limmers also attempt to
distinguish Rogers and Knight by arguing they apply only to Aeconomically
useful obstructions.@  This argument is also unpersuasive.  In its analysis, the Rogers court
cited two vegetation cases from Illinois and the Cordell case, which
involved a pile of stumps and roots.  See
Rogers, 40 S.W. at 958 (citing Dimick, Stables, and Cordell
cases); Dimick v. Chicago & Northwestern Ry. Co., 80 Ill. 338 (Ill.
1875) (considering sight restrictions caused by trees and brush on the
right-of-way as a circumstance affecting determination of plaintiff=s
contributory negligence); Indianapolis & St. Louis R.R. Co. v. Stables,
62 Ill. 313 (Ill. 1872) (considering sight restrictions caused by bush and
shrubs in determining negligence of railroad company in operating the train); Cordell,
70 N.Y. at 121B23 (holding that sight
restrictions caused by large pile of stumps and roots and other material is not
an independent basis of liability but only a circumstance to be considered in
determining plaintiff=s
contributory negligence and the negligence of the train operator); see also
LaRocco v. Penn Cent. Transp. Co., 324 N.Y.S.2d 82, 83 (N.Y. 1971)
(applying Cordell to sight restriction caused by physical condition of
the road and track crossing).  Although
Knight involved sight restrictions relating to structures built near the
tracks, it also involved sight restrictions relating to piles of cotton and
railroad Aties.@  See Knight, 45 S.W. at 556.  Furthermore, the Texas Commission of Appeals
applied Rogers and Knight to sight restrictions caused by
vegetation, and Texas courts of appeals have done likewise.  See McCrorey, 23 S.W.2d at 692B95
(applying Rogers and Knight to sight restrictions caused by grass
and weeds along the right-of-way); Rubrecht, 445 S.W.2d at 787B89
(applying Rogers and Knight to sight restrictions caused by trees
and weeds along the right-of-way); Anderson, 144 S.W.2d at 442B45
(applying Rogers and Knight to sight restrictions caused by
timber and underbrush along the right-of-way); Adams, 27 S.W.2d at 335
(applying Rogers and Knight to sight restrictions caused by a
hill); Oden v. Tex. & P. Ry. Co., 9 S.W.2d 367, 368B71 (Tex.
Civ. App.CTexarkana 1928, no writ) (applying
Rogers and Knight to sight restrictions caused by weeds and
bushes along the right-of-way).








The Limmers cite three Texas
cases in support of their argument that Rogers and Knight apply
only to Aeconomically
useful obstructions.@  See St. Louis Southwestern Ry. Co. of Tex.
v. Larkin, 34 S.W.2d 693, 702 (Tex. Civ. App.CDallas
1930, writ dism=d); St.
Louis, S.F. & T. Ry. Co. v. Allen, 296 S.W. 950, 953 (Tex. Civ. App.CAmarillo
1927, writ dism=d); Missouri,
K & T. Ry. Co. of Tex. v. King, 123 S.W. 151, 152 (Tex. Civ. App.CDallas
1909, no writ).  The Allen and King
cases do not support the Limmers= argument
in this regard; rather, without citing Knight, the Allen and King
courts state in obiter dicta that certain sight restrictions constitute an
independent basis of liability.  See
Allen, 296 S.W. at 951B53
(stating that trial court properly submitted special issue as to whether
alleged sight restriction caused by weeds and grass was independent basis of
liability, without mention of whether weeds and grass were used in railroad
company=s
business, in case where court affirmed judgment in favor of plaintiff based on
jury answers to special issues that supported several independent basis of
liability, at least two of which involved the operation of the train); King,
123 S.W. at 152B53
(stating it was permissible for the trial court to charge the jury on defendant=s alleged
failure to eliminate sight restrictions caused by trees and coalhouse as an
independent basis of liability, without citing Knight, and in an appeal
in which the court reversed and remanded for a new trial based on charge error
regarding Adiscovered peril@).  These obiter dicta are incorrect under Rogers
and Knight.  See Knight, 45
S.W. at 557B58; Rogers, 40 S.W. at 957B58.  

The only language that supports
the Limmers= argument is more dicta found in
the Larkin case.  Larkin,
34 S.W.2d at 702 (stating A[o]bstructions
placed by a railroad on its right of way that are necessary, either for the
transaction of the business of the railroad or for its operation, and
obstructions placed on the right of way by others, with permission of the
railroad, to be used in connection with the business of the railroad, cannot be
made an independent ground of negligence . . . .@).  The Larkin court, however, did
not address the propriety of the charge regarding sight restrictions, and it
affirmed a judgment for the plaintiff based on special issues supporting three
different alleged grounds of negligence, two of which involved the operation of
the train.  Id. at 696B97.  Therefore, the statements in Larkin
upon which the Limmers rely were not necessary to the court=s
disposition of the appeal and are obiter dicta. 
See Edwards v. Kaye, 9 S.W.3d 310, 314 (Tex. App.CHouston
[14th Dist.] 1999, pet. denied).  In
addition, the distinction made in Larkin as to whether the cause of the
sight restriction is used in the railroad company=s
business is expressly rejected in the above analysis.  See McCrorey, 23 S.W.2d at 692B95; Rubrecht,
445 S.W.2d at 787B89; Anderson,
144 S.W.2d at 442B45; Adams,
27 S.W.2d at 335; Oden, 9 S.W.2d at 368B71.  Moreover, other states following the rule
adopted in Rogers and Knight do not make the Aeconomically
useful obstruction@
distinction.  See, e.g., LaRocco,
324 N.Y.S.2d at 83 (applying same rule under New York law to sight restriction
caused by physical condition of the road and track crossing); Johnston,
199 So.2d at 843B44
(applying same rule under Alabama law to sight restrictions caused by
vegetation); May v. S. Ry. Co., 129 S.E.2d 624, 626B28 (N.C.
1963) (applying same rule under North Carolina law to sight restrictions caused
by vegetation); Cowles, 66 A. at 1023 (applying same rule under
Connecticut law to sight restrictions caused by trees).  There is no merit in the Limmers= attempt
to distinguish Rogers and Knight based on a requirement that the
sight restriction be caused by an Aeconomically
useful obstruction.@








Because the alleged theory of
negligence liability submitted in Question 3 is not an independent basis of
liability under Texas law, we sustain Union Pacific=s second
issue.  The trial court=s error
is reversible if it Aprobably
prevented the appellant from properly presenting the case to the court of
appeals.@  See Tex.
R. App. P. 44.1(a)(2); Romero, 166 S.W.3d at 227.  The Texas Supreme Court has stated that this
type of error is reversible unless the reviewing court is reasonably certain
that the jury was not significantly influenced by the issues erroneously
submitted to it.  See Romero,
166 S.W.3d at 227B28.  The Romero court determined that the
trial court=s erroneous submission of one
claim that was not supported by the evidence[25]
was reversible error because the jury apportioned responsibility in a single
question based on its affirmative liability findings under the erroneously
submitted claim and another properly submitted claim.  See id.  The Romero court stated that, because
the jury found liability as to the improperly submitted claim, Athe jury
could not conceivably have ignored that finding in apportioning responsibility.@  Id. 
We are not reasonably certain that the jury in this case was not
significantly influenced by the liability theory that was erroneously submitted
to it in Question 3; therefore, we conclude that this error requires reversal
of the judgment and a new trial.[26]  See id.  

                                                                Conclusion

There is legally and factually
sufficient evidence to support the trial court=s implied
findings that Union Pacific failed to prove federal funds were expended to
install warning devices at the Front Street Crossing under the 1977 Program and
under the 1989 Program. 








Under Texas common law as announced by the Texas Supreme Court and
followed by lower courts, Texas does not recognize the negligence claim
submitted to the jury in Question 3 as an independent basis of liability.  Because we are not reasonably certain that
the jury in this case was not significantly influenced by the liability theory
that was erroneously submitted in Question 3, we conclude that this error
requires reversal of the judgment and a new trial.  Accordingly, we sustain Union Pacific=s second
issue, reverse the trial court=s
judgment, and remand this case to the trial court for a new trial in accordance
with this opinion.

 

 

 

 

/s/        Eva M. Guzman

Justice

 

Judgment rendered and Opinion on Rehearing filed November 29, 2005.

Panel consists of Chief Justice Hedges and Justices Frost and Guzman.

 

 











[1]  The tracks had
previously been owned by Missouri Pacific Railroad Company, but that company
was subsequently acquired by Union Pacific Railroad Company.  At the time of the accident, Union Pacific owned
the tracks.





[2]  Question 1
defined an extra-hazardous crossing as follows:

 

A railroad
grade crossing is Aextra-hazardous@ when,
because of surrounding conditions, it is so dangerous that person [sic] using
ordinary care cannot pass over it in safety without some warning other than the
usual cross buck [sic] sign.





[3]  Question 2 was
conditioned on an affirmative response to Question 1 and stated as follows:

 

Was the negligence, if any, of the Missouri Pacific
Railroad, through its agents or employees, a proximate cause of the collision
in question? 

In answering this question, you may consider only the following acts of
negligence, if any: (1) failure to provide automatic signals (such as flashing
lights or gates); (2) failure to provide a flag man at the Front Street
crossing; and/or (3) failure to install a stop sign.





[4]  Question 3
provided as follows:

 

Was the negligence, if any, of the Missouri Pacific
Railroad, through its agents or employees, a proximate cause of the collision
in question?  

In answering this question, you may consider only the following acts of
negligence: (1) failure to eliminate a sight restriction, if any, caused by a
pile of crushed limestone at the crossing; and/or (2) failure to eliminate a
sight restriction, if any, caused by vegetation at or near the crossing.





[5]  For example,
in discussing procedural matters related to the preemption issue, the trial
court stated that A[the preemption issue] is an issue that the Court is
going to decide and it=s not an issue that goes to the jury . . . .@  The trial
court also asked counsel, A[I]s [the resolution of the preemption issue] really
that different from, let=s say, if they were arguing attorneys fees to me?  That=s
something that I would be considering, not the jury.@





[6]  At a pretrial
conference just before trial, the Limmers agreed to the trial court=s granting Union Pacific a running objection to the
evidence at the jury trial, so as to not waive Union Pacific=s argument that federal law preempts all of the
Limmers= claims.  In the
course of discussing this running objection, the trial court told Union Pacific=s counsel, AI don=t think you should have to stand up and use the word
preemption at all during this case.@  In response, the Limmers= counsel stated, AThat=s fine with me, Judge.@  





[7]  Union Pacific
cites Cadillac Insurance Co. v. L.P.C. Distributing Co., 770 S.W.2d 892,
895 (Tex. App.CSan Antonio 1989, writ denied), for the proposition
that federal preemption is a challenge to the court=s subject matter jurisdiction and, thus, is always a
question of law.  Cadillac Insurance
does not hold that all preemption arguments defeat the trial court=s jurisdiction. 
Rather, it deals with state law claims relating to an employee benefit
plan under the Employee Retirement Income Security Act (AERISA@). Cadillac Insurance Co., 770 S.W.2d at
893.  ERISA, unlike the statutes at issue
in this case, contains a provision creating exclusive jurisdiction for the
federal courts as to the issues involved in the Cadillac Insurance
case.  See 29 U.S.C. ' 1132(e) (1999). Therefore, Cadillac Insurance
is not on point.  See Mills v. Warner
Lambert Co., 157 S.W.3d 424, 427B28 (Tex.
2005) (distinguishing ERISA cases because they relied on exclusive-jurisdiction
provision in ERISA and because statute at issue contained no such provision).





[8]  All statutory
citations are to the current version of the statute, unless otherwise noted.





[9]  Union Pacific
asserts that, at his deposition, Kosmak testified to the actual expenditure of
federal funds at the Front Street Crossing; however, the cited testimony is
vague.  When asked whether he could
testify under oath specifically as to how much federal money, if any, was
actually spent on the Front Street Crossing to upgrade or change the warning
devices before Billy Limmer=s death, Kosmak stated that A[t]here were federal funds expended, but I don=t know how much specificallyCokay, how many dollars were expended.@  Based on other
portions of his deposition testimony, the trial court could have determined
that Kosmak did not mean that federal funds were expended on the Front Road
Crossing but that federal funds were expended generally in the 1977 and/or 1989
Program and Kosmak does not know if any funds were expended on the Front Street
Crossing.  Even if this testimony had the
meaning ascribed to it by Union Pacific, we presume the trial court credited
other parts of Kosmak=s deposition testimony, in which Kosmak testifies that
he does not know whether anything actually occurred at the Front Street
Crossing as a result of the 1977 Program or whether any federal or state money
was spent at the Front Street Crossing under the 1977 Program or the 1989
Program.  See City of Keller, 168 S.W.3d at 819.





[10]  Union Pacific also emphasizes Woods=s testimony that he is not aware of
any Union Pacific program to put in metal reflectorized crossbuck blades.  However, at the time of the 1977 Program,
Missouri Pacific owned the Front Street Crossing.  Although Union Pacific subsequently acquired
Missouri Pacific, if a railroad company installed reflectorized crossbucks or
other passive warning devices at the Front Street Crossing before 1977, it
would have been Missouri Pacific or one of its predecessors rather than Union
Pacific. 





[11]  In his
testimony, Woods distinguished between Aadditional
warning@ and Aadditional protection.@ Woods stated
that automatic lights
and gates provide additional warning to
motorists and then insisted that this additional warning does not provide
additional protection to motorists.





[12]  The Limmers
assert that there was contrary evidence based on the 1976 letter and
Heathington=s testimony.





[13]  Union Pacific
asserts that specific, individualized information is not required for it to
have conclusively proven as a matter of law that federal funds were expended to
install warning devices at the Front Street Crossing under the 1977 Program.
Union Pacific cites several cases in support of this proposition.  None of these cases involve an appeal by the
railroad company from an adverse finding by the trial court, and none of these
cases address the interested-witness rule. 
Furthermore, the evidence in these cases was significantly different
from the evidence in this case.  See O=Bannon v. Union Pac. R. Co., 169 F.3d 1088, 1089B90 (8th Cir. 1999) (affirming summary judgment based
on evidence that included specific evidence that a crossbuck sign and post were
installed at crossing in question in federally funded project);  Wagoner v. CSX Transp., Inc., 246
F.Supp.2d 1002, 1007 (N.D. Ind. 2003) (discussing summary-judgment affidavit of
railroad employee at the time of the project in question who specifically
testifies that he has personal knowledge that federal funds were used to
install crossbuck signs at the crossing in question); Security First Bank v.
Burlington No. & Santa Fe Ry. Co., 213 F.Supp.2d 1087, 1090 (D. Neb.
2002) (describing the summary-judgment evidence only in general terms, stating
that the evidence shows that the crossing in question was included in a
federally funded project, and stating that the evidence was similar to the
evidence in the O=Bannon
case); Strozyk v. Norfolk S. Corp., No. Civ.A.01-2478, 2002 WL 1226857,
at *2 (E.D. Pa. June 5, 2002) (stating that summary-judgment evidence included
document with a specific description of the work to be completed at the
crossing in question under a federally funded program as well as affidavit
testimony that crossbuck signs were installed at that crossing using federal
funds), rev=d on other grounds, 358 F.3d 268 (3rd Cir. 2004); McDaniel v. Southern Pac. Transp.,
932 F. Supp 163, 167B68 (N.D. Tex. 1995) (stating that there was
summary-judgment evidence showing that federal funds were expended under the
1977 Program at all Southern Pacific public road crossings and not mentioning
any circumstances tending to discredit or impeach the railroad company=s evidence).   





[14]  Kosmak
testified that it cost $10 to purchase retroreflectorized tape for a railroad
crossing like the Front Street Crossing.





[15]  This approach
is consistent with the approach taken by United States District Judge Sim Lake
in addressing whether retroreflectorized tape allegedly installed under the
1989 Program constituted a warning device for purposes of the railroad company=s preemption defense.  See Lesly v. Union Pac. R. Co., No. H-03-0772,
U.S. Dist. LEXIS 23018, at *11B12 (S.D. Tex. June 25, 2004). 





[16]  The 1989 Texas
statute implementing the 1989 Program and the letter in evidence from the
United States Department of Transportation regarding this program both use the
term Aretroreflectorized.@  On the other hand, in some of the testimony,
witnesses and lawyers use the words Areflectorized@ or Aretroreflective@  instead. 
For the sake of consistency, we use Aretroreflectorized@ throughout this opinion.  





[17]  See Act
of May 17, 1989, 71st Leg., R.S., ch. 269, ' 1, 1989
Tex. Gen. Laws 1212, 1213 (formerly codified at Tex. Rev. Civ. Stat. Ann art. 6370b), repealed by Act
of May 1, 1995, 74th Leg., R.S., ch. 165, ' 24(a),
1995 Tex. Gen. Laws 1025, 1870.





[18] In McDaniel v. Southern Pac. Transp., the
district court mentions the 1989 Program, does not address whether
retroreflectorized tape is a warning device, and, in the final analysis, bases
its summary judgment on the 1977 Program. 
See 932 F. Supp. 163, 167 (N.D. Tex. 1995).    





[19]  Other than the
unpublished Enriquez and Lesly cases cited below, our research
has found only one case addressing whether an addition or enhancement to a
preexisting warning device is itself the installation of a warning device.  See St. Louis Southwestern Ry. Co. v.
Malone Freight Lines, Inc., 39 F.3d 864, 867 (8th Cir. 1994) (stating that
replacement of eight-inch lenses in existing flashing lights at railroad
crossing with twelve-inch lenses did not constitute the installation of a
warning device).  





[20]  We only
analyze these issues as to the tape in question at the Front Street Crossing,
not as to all retroreflectorized tape. 
It is possible that some retroreflectorized tape might meet the
definition of warning device that we apply in this case.





[21] Even without any deference to the statement in
Shelley Row=s letter that retroreflectorized tape is not
considered a traffic control device, the evidence is sufficient to support the
trial court=s implied finding that the tape in question does not
meet the applicable definition of warning device.  Therefore, we need not and do not address the
issue of the amount of deference, if any, that we should give to this
statement. 





[22]  For ease of
reference, this line of cases is referred to as the AMichalke
line of cases.@





[23]  The Rogers court also cites
the Dillingham case for the proposition that it is a fact question for
the jury whether sight restrictions constitute negligence by the railroad
company.  40 S.W. at 957B58.





[24]  Even though some states have determined that the
failure to eliminate sight restrictions can be an independent basis of
liability, see, e.g., Alabama Great S. Ry. Co. v. Lee, 826 So.2d 1232,
1236 (Miss. 2002) (holding that under Mississippi precedents, railroad company
may be independently liable for its negligent failure to eliminate sight
restrictions caused by vegetation on its right-of-way), others hold that the
failure to eliminate sight restrictions does not constitute an independent
basis of liability, although the sight restrictions may be considered by the
fact finder in assessing the negligence of the train operator, see, e.g.,
Alabama Great S. Ry. Co. v. Johnston, 199 So.2d 840, 843B44 (Ala. 1967); Cowles v. New
York, N.H. & H.R. Co., 66 A. 1020, 1023 (Conn. 1907); Cordell,
70 N.Y. at 119.  The Texas Supreme Court
has chosen the latter rule, and this court cannot change the law in this
regard.  See Lubbock County, Tex.,
80 S.W.3d at 585; McCrorey, 23 S.W.2d at 694B95.





[25]  The Supreme
Court has held that, in conducting a Casteel harm analysis as to charge
error, appellate courts treat charge error based on an invalid liability theory
the same as charge error based on a liability theory not supported by the
evidence.  See Romero, 166 S.W.3d
at 227.  





[26]  Because of our
disposition of this case, we need not address Union Pacific=s third and fourth issues or its argument that 49
C.F.R. 213.37(b) preempts the alleged liability submitted to the jury in
Question 3.